**UNITED STATES of America**

v.

**John VAN ALLEN et al., Defendants.**

United States District Court
S. D. New York.

Aug. 21, 1962.

See also 28 F.R.D. 329.

Robert M. Morgenthau, U. S. Atty., for the Southern Dist. of New York, for United States, Arthur L. Liman, Asst. U. S. Atty., of counsel.

Albert J. Ahern, Jr., Washington, D. C., for defendant, Roy B. Kelly.

Blalock, Lohman & Blalock, Houston, Tex., for defendant, Cecil V. Hagen, Jack B. Blalock, Houston, Tex., Marvin B. Segal, New York City, of counsel.

Brinsmade & Schafrann, New York City, for defendant, Gulf Coast Leaseholds, Inc.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants, Jules Bean and Singer, Bean & Mackie, Inc., Milton R. Wessel, Samuel Myers, Nathan Lewin, New York City, of counsel.

Thomas H. Casey, New York City, for defendants, Milton J. Shuck and M. J. Shuck Co.

CASHIN, District Judge.

Defendants move to dismiss the indictment in the instant case on the ground that improper selection of the Grand Jury denied them of their right to a representative Grand Jury. They also move to suppress all evidence taken by the Grand Jury together with all leads and clues derived therefrom.

The Court set this matter down for a hearing commencing on April 11, 1962. The defendants presented to the court eight witnesses, including William J. Borman, Deputy Clerk in charge of jurors for the Southern District of New York, several eminent educators and authorities in the fields of political science, sociological research, and statistical analysis of voting and registration trends throughout the United States, and others. The hearings, which continued for four court days, were completed on May 15, 1962, and resulted in a transcript of several hundreds of pages of testimony.

The Grand Jury which returned the indictment in the present case was impanelled on December 8, 1959. The indictment was filed on March 24, 1960.

The defendants' motion, directed to the selection of the Grand Jury returning the indictment, attacks primarily the custom in this district of utilizing voting registration lists as the main source to obtain names for the list of qualified jurors, from which list the Grand Jury in the instant case was selected. Defendants contend that such use of registration lists, and the other procedures followed by the officials in this district in drawing the Grand Jury, result in a violation of federal law (28 U.S.C. § 1861, as amended by the Civil Rights Act of 1957, 71 Stat. 638), in that such practices operate to systematically pass over and thereby exclude from jury service those who have failed to register. Since, it is claimed, those persons who fail to register are, more likely than not, members of the lower economic and social classes, the juries which result are allegedly atypical "blue ribbon" or "purified" juries which are unrepresentative of the general community. The defendants contend that the panels selected are weighted in favor of the wealthy, the professional and the well-educated, and as such the December 8, 1959 Grand Jury is an unlawfully constituted body.

The Southern District of New York is the busiest district in the nation. It is consequently expedient for it to maintain a very large pool of qualified prospective jurors from which the necessary talesmen may be summoned for service. The list of qualified jurors contains approximately 22,000 names. Due to the fact that many of the persons on the list subsequently move away, die, become ill, or become otherwise unavailable for ju-

ry duty, the list must be constantly filled anew. Prior to the addition of new persons to the pool of qualified jurors, it is necessary to have a preliminary examination at which time it is determined whether the individuals are capable of serving and whether they meet the statutory qualifications. Persons are summoned for such examination by the sending out of qualification notices through the mail. The names of the persons who are to receive these notices are generally chosen from the most recent presidential voting registration lists of the Counties of New York, Bronx and Westchester, New York. The Grand Jury of December 1959, which returned the indictment under attack in the instant case, was selected from a pool of names from the 1956 presidential registration lists for Manhattan and the Bronx, and the 1957 registration list for Westchester. In the case of Westchester County, the registration lists utilized were restricted to the area south of White Plains, nearest to New York City. This was properly done to avoid unnecessary expense to the government, and to prevent the harrassment of jurors by obliging them to travel excessively long distances to the courthouse from the remote areas in which they live. Report of the Judicial Conference Committee on the Operation of the Jury System, The Jury System in the Federal Courts, p. 13 (1960).

The Boards of Elections of Bronx and New York Counties prepare a list of registered voters for each assembly district, with registered voters being listed by election districts for each of the assembly districts. The registrants' names appear in parallel vertical columns on successive pages, listed by street address. A certain key number is selected at random, usually the number 5 or 10, and qualification notices are made out addressed to every 5th or 10th name on each of the columns for the assembly district. Eventually, all the assembly districts are covered in rotation, and the process is later repeated with a different number when more names are required. Selections are thus made by this random process from all parts of the counties. Basically the same procedure is followed with the wards and towns of Westchester County nearest to the City of New York.

These voting registration lists are the source from which approximately 95% of the prospective jurors are chosen. Miscellaneous sources, such as recommendations, and in some years telephone directories and real estate listings, account for the remaining small percentage, which since 1950 has never exceeded 5%.

All these names are placed on postal cards which are placed on file and sent out periodically as the need arises. They request the addressee, the prospective talesman, to appear on a certain day so that inquiry as to his qualification to serve may be made. The response to this notice is about 97%. If a prospective juror, upon being summoned to the courthouse and questioned by the jury clerk or one of his assistants, demonstrates his competence within the meaning of 28 U.S.C. § 1861, that prospective juror is deemed to be qualified. Those who appear personally at the jury office are preliminarily interviewed to uncover physical infirmities, exemptions, serious hardship or other reasons for disqualification. If the prospective juror at the outset of the interview discloses that he is exempt from jury service, or disqualified, or pleads that such service would cause physical or financial hardship upon him, he would not be "qualified". Those who are not thereby disqualified are required to answer a questionnaire. The questionnaire elicits no information concerning the juror's race, politics, religion, or social connections. If the interview and the questionnaire information indicate that the prospective juror is qualified, his name would be added to the active list of jurors. History cards and wheel cards are made out and are maintained on file in the clerk's office.

The Petit Jury wheel from which a panel of prospective petit jurors is drawn usually contains between 2,400 and 2,900 wheel cards, and the Grand Jury wheel between 600 and 700 cards. The names

in the wheel comprise qualified jurors (1) taken from the file of those jurors whose last jury duty was more than two years ago, (2) who were called for service but excused three months previously, (3) who were marked for service in the particular month by a judge hearing excuses, and (4) those new jurors who qualified for service in the immediately preceding month. From this wheel 75 cards comprising the panel were drawn. Notices were sent to the 75 talesmen on the panel to appear for the drawing of the Grand Jury on December 8, 1959. The names of those 75 persons on the panel were placed in the wheel, and 23 names were drawn by lottery and sworn in to comprise the Grand Jury of that date.

I come first to the defendants' objection to the use of registration lists to select jurors. It should be noted that since there is no available list containing the names of all members of the population residing in this district, it would be possible to propound arguments against any source which is utilized for the selection of jurors. For example, it could be argued that the use of telephone directories would tend to exclude the poor, because as a class they would not be able to afford as many telephones as those in better financial circumstances. The same objection could also be made to the use of realty lists. Conversely, executives and professionals could object to the use of labor union membership lists.

■ It should be obvious that no system can be devised for obtaining a perfectly representative source of names of prospective jurors. This is especially true in the Southern District of New York, within the limits of which resides undoubtedly the most heterogeneous population in the nation, almost 5,000,000 people of every creed, color, national origin, economic status, and political and social background. It is therefore not necessary that every jury contain representatives of all groups of the community; indeed, it has been recognized that this would be impossible and undesirable. Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181

(1946); United States v. Flynn, 216 F.2d 354 (2 Cir. 1954), cert. den., 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955); Young v. United States, 94 U.S.App.D.C. 54, 212 F.2d 236, 238 (1954).

■ Congress has wisely not prescribed the use of any particular source of names of prospective jurors. All that is required is that the source be reasonably designed to produce a fair cross-section of the community, with no systematic exclusion of any race, creed, social or economic group. Padgett v. Buxton-Smith Mercantile Co., 283 F.2d 597 (10 Cir. 1960), cert. den., 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705.

■ It has heretofore been held in this district that the utilization of registration lists as a source of prospective jurors is such a permissible method of selection. United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961). After a very lengthy and learned analysis of the procedure used in this district, Judge Frederick vP. Bryan concluded there that the only common factor which non-registrants possess is their failure to exercise the right of franchise at a given election. 2 Cir., 200 F.Supp. at 391. Since they are "united only in disinterest" and lack "any fixed composition or thread which binds those in this category into a cohesive group," he held that there is "no indication that the failure to canvass such persons defeats in any way the concept of an array from which impartial representative juries may be selected." Ibid.

Unlike United States v. Greenberg, where there was no request to have testimony taken, the defendants in the instant case have presented voluminous testimony to the court in an attempt to sustain their burden of demonstrating that the use of registration lists was not designed to reasonably produce a jury representative of a cross-section of the community. The evidence adduced by defendants has, however, not been convincing.

The defendants produced eminent political scientists and analysts whose con-

clusions were for the most part based upon studies of voting and registration trends on a nationwide scale. The first study was based upon the 1948 election, and was conducted by the American Institute of Public Opinion, the Gallup organization. The second study, which considered voting in 1960, was made by Elmo Roper. Both of these studies revealed general characteristics of non-registrants. It was claimed that the non-registrant was more likely than not a negro, a woman, a younger person, a semi-skilled or unskilled worker, a person with a lower education, and a member of the lower income groups.[1]

■ The process of jury selection must draw upon a cross-section of the community. Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). The array to be representative must not exclude members of the lower economic and social groups. Defendants have shown that members of certain races and groups tend to live predominantly in certain districts of Manhattan, the Bronx, and Westchester, while higher income citizens tend to be found predominantly in other districts. Although the defendants concede that members of the "lower" groups register in their districts as "higher" groups do in their districts, the experts who testified for the defendants contend only that the proportion of registrants among certain groups of people is lower than among others. But even assuming the validity of the witnesses' opinions, it is obvious from the studies offered in evidence that the defendants have failed to demonstrate that the so-called "class" of "non-registrants" is an existent "class" at all.

It cannot be said that non-registrants represent a certain or cognizable group of persons. Non-registrants vary from election to election. The defendants' statistics merely indicate that a sizable number of persons of all racial, social and economic groups are delinquent in their civic obligations. That this delinquency may vary somewhat by race, sex, age, or other factor, does not by any means prove that "non-registrants" can be stereotyped into one "excluded group" of negroes, women, young persons, etc. Great numbers of young persons, negroes, women, and poor persons do register and their names are included on the lists utilized in this district as the source of prospective jurors. It is undisputed that in New York registration is available to all qualified persons, with strict legal prohibition against discrimination based upon race, sex, religion, national origin, or wealth. Thus, the use of registration lists to select jurors actually

1. The Roper Study revealed 11.6% non-registration for women, and 7.2% for men. The Gallup Study was similar with 10.5% for women, 7.1% for men.

In 1960, 13.3% of the negroes questioned had not registered while only 8.7% of the white had failed to register. The 1948 statistics were 14.2% and 10.9% respectively.

The Roper Study found 14.3% registration delinquency among the 21 to 25 year old group, which descended to 13% for those 26 to 34 years old, and 7.5% for those between the ages of 35 and 49, but ascended to 7.8% for those over the age of 50.

With regard to economic status, it was claimed that non-registration increases as economic status decreases. In 1960, 19.5% of the "poor" failed to register, as compared to 9% of the "average", and 3.5% of the "above average." However, the percentage of non-registrants among the "wealthy" class rose to 9.5%.

Segregated by levels of education, the Gallup survey of 1948 revealed that of those persons interviewed, 18.4% of those with no education failed to register; 12% of those with from 1 to 6 grades of grammar school; 14% of those with 7 to 8 grades; 12.5% of those who had failed to complete high school; 10.1% of those who were high school graduates; 7.3% of graduates of trade, business, vocational, and nursing schools; 5% of college graduates.

The Roper Study in 1960 showed that over 25% of the non-educated did not register; 13% of those with a grade school education failed to register; 9% of those with a high school education failed to register; 3.4% of those with a college education were non-registrants.

guarantees the presence of these groups on the jury list.

The cases upon which the defendants rely are distinctly inapplicable to the instant case. The decision in United States v. Hoffa, 196 F.Supp. 25 (S.D.Fla. 1961) was dictated by the peculiar circumstances existent in the State of Florida, factors which do not prevail in the Southern District of New York. In the Hoffa case, the jury commissioner and deputy clerk deliberately excluded from jury service an "extremely high" percentage of qualified citizens. 5 Cir., 196 F.Supp. at 29. In three of the four counties involved, the names were limited to those appearing on the list of jurors then selected for service in the state courts, thereby eliminating the element of independent discretion which federal jury officials should possess. The situation was worsened by the fact that all women who had not volunteered for jury service in the state court were excluded from federal duty.

In Thiel v. Southern Pacific Company, supra, the jury commissioner and clerk intentionally excluded from the jury lists all persons who worked for a daily wage. By drawing an unreasonable line between daily, weekly or monthly workers, the jury officials there effected a complete exclusion of daily wage earners. That practice does not exist in this district.

■ I also find no merit in the defendants' contention that the array from which the Grand Jury was selected was vitiated by the fact that it was drawn from a pool which included some persons who had been selected many years ago from sources other than registration lists. Suffice it to say that the defendants have failed to demonstrate how such an insignificant number of persons could conceivably influence to any perceptible extent the representative character of the pool. United States v. Greenberg, 2 Cir., 200 F.Supp. 382, 393.

■ I come now to the next ground asserted by defendants for dismissal of the indictment. Defendants object to the custom followed by the jury clerk of this district of recognizing state exemptions in excusing persons from jury service, if such exemptions are asserted by those called for a qualification interview. As heretofore explained, in response to the qualification notices received in the mail, the addressees appear in the jury officials' office for determination of their competence to serve as federal jurors. Mr. Borman, Deputy Clerk in charge of jurors, testified that his determination whether such persons are competent depended solely upon the provisions of 28 U.S.C. § 1861, as revised by the Civil Rights Act of 1957. That section reads as follows:

"Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

"(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

"(2) He is unable to read, write, speak, and understand the English language.

"(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

If the person fulfilled the requirements of Section 1861, he would be "qualified". If, however, the person on his own initiative, before he was qualified, requested to be excused, the jury clerk would as a courteous custom place his name on the ineligible file, if such person asserted that he came within one of the exempt categories under state law. (N.Y.Judiciary Law, § 599). If, for example, a fireman, physician, teacher or clergyman requested to be excused from service, the jury clerk would excuse him. In like manner, if a woman with a family or small children requested to be excused, the jury clerk would not insist that she be qualified. Mr. Borman testified that he and his deputies do not take it upon

themselves to suggest to such persons that they need not serve. He further testified that if such persons desire to serve, the clerks do nothing whatever to impede their so doing. If the clerks did impede such groups from serving upon federal juries, such activity would indeed contravene the provisions of Section 1861, as that statute was amended by the Civil Rights Act of 1957. There is, however, no evidence to that effect in the case at bar. In fact, the totality of the evidence demonstrates that if no objection is made by the persons being interviewed, the clerk immediately qualifies all those who satisfy the requirements of Section 1861, there being no exclusion of any group. The clerk merely acquiesces in the public interest to the granting of excuses to those otherwise competent individuals who, before they become qualified, *sua sponte* assert exemptions.

█ The defendants are in error in denominating this custom a usurpation of the district judge's power. The evidence at bar indicates that various Chief Judges of this district have reviewed the above procedure and have authorized the clerk to continue it to the present day.

District judges have the discretionary power, in the public interest, to excuse individuals or groups of persons if jury service would entail undue hardship or extreme inconvenience. 28 U.S.C. § 1863. The authority of a Chief Judge to delegate that task to the clerk, for the latter to perform, before the names of the particular jurors have been placed in the jury wheel, subject to the former's vigilant review, is necessarily and implicitly contained in 28 U.S.C. § 956. See United States v. Flynn, 216 F.2d 354, 387 (2 Cir. 1954), cert. den., 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955); Fay v. New York, 332 U.S. 261, 271, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). In like manner, the authority of the clerk and commissioner to exclude jurors at the outset if they feel that the juror would be prevented from rendering effective service as a juror by reason of financial hardship is found in 28 U.S.C. § 1864, wherein the clerk and commissioner are directed by statute to

fill the box with "qualified persons." If the officials follow the definite policy instructions of the Chief Judge, there is no need in every instance to burden and oppress the judge by resorting to an order of the court. See Report of the Judicial Conference Committee on the Operation of the Jury System, op. cit. supra, p. 33.

The defendants' motions to dismiss the indictment on the ground of improper selection of the Grand Jury, and to suppress all evidence taken by the Grand Jury together with all leads and clues derived therefrom, are denied.

The above shall constitute my Findings of Fact and Conclusions of Law.

It is so ordered.