**UNITED STATES of America**
**v.**
**Joseph LEONETTI et al.**

**UNITED STATES of America**
**v.**
**Geoffrey Reed CONKLIN.**

**UNITED STATES of America**
**v.**
**George A. HORVATH et al.**

**UNITED STATES of America**
**v.**
**Antonio John FARGAS.**

**UNITED STATES of America**
**v.**
**Henry DUBBIN et al.**

**UNITED STATES of America**
**v.**
**Allan Aaron SHAPIRO.**

**UNITED STATES of America**
**v.**
**Toney Marshall HUDSON, Jr.**
**Nos. 65 Cr. 649, 66 Cr. 688, 66 Cr. 732, 66 Cr. 792, 67 Cr. 361, 67 Cr. 621, 67 Cr. 681.**

United States District Court
S. D. New York.
June 10, 1968.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, by Michael W. Mitchell and Abraham D. Sofaer, Asst. U. S. Attys., for the United States.

Michael O. Finkelstein, New York City, appearing specially for all defendants.

Ballon, Stoll & Shyman, New York City, for Lila Roberts and Istvan Hajdu.

Maurice Edelbaum, New York City, for George Horvath.

Kunstler & Kunstler, New York City, for Matthew Naphtali.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Henry Dubbin.

Rabinowitz, Boudin & Standard, New York City, for Geoffrey Conklin, Antonio Fargas, and Toney Marshall Hudson, Jr.

Raichle, Moore, Banning & Weiss, Buffalo, N. Y., for Sidney Stein.

Arnold D. Roseman, New York City, for Isadore Cohen and Aaron Himmelstein.

Segal & Morrison, New York City, for Leo Davis.

Shea, Gallop, Climenko & Gould, New York City, for Arthur Teich, Erwin Sacks-Wilner.

Mortimer Todel, New York City, for Herman Potrock.

TYLER, District Judge.

This memorandum treats motions in the above cases challenging the grand and petit jury systems in this district. Jury challenges of this type have frequently been before this court and the Court of Appeals for this Circuit. E. g., United States v. Flynn, 216 F.2d 354 (2d Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955); United States v. Dennis, 183 F.2d 201 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961); United States v. Van Allen, 208 F.Supp. 331 (S.D.N.Y.1962), aff'd sub nom. United States v. Kelly, 349 F.2d 720, 777–779 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). Both the Court of Appeals and this court have suggested that principles of *stare decisis* should be dispositive of the frequent attacks on the jury systems of this court. United States v. Kelly, supra, at 778; United States v. Kenner, 36 F.R.D. 391, 392–393 (S.D.N.Y.1965).

The movants, however, urge that changes in the law—specifically the recent 5th Circuit decision in Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966) (en banc)—require a reappraisal of the decisions of this Circuit sustaining the validity of the jury mechanism in this district. In addition, they claim that none of the past challenges to either our grand or petit jury systems was grounded in an adequate record. Specifically, they correctly point out that no broad-based analysis of the results of these systems had ever been conducted. In sum, the movants say that, in combination, these two factors rendered it improper to dismiss their claims without a hearing. A hearing has been granted, therefore, and its results will be discussed in this memorandum.

Because of the similarity of the issues raised, this court directed consolidation of these motions in an order dated October 26, 1967. Thereafter, the movants were allowed discovery of certain

records reflecting the operation of the jury system; in addition, they were permitted to take the deposition of Mr. William Borman, the deputy clerk of this court who is responsible for administering the jury system. Discovery was finally completed in late December, 1967. The movants were then allowed time to assimilate and analyze the collected data, and to marshal their legal arguments. On February 21, 1968, they submitted, pursuant to direction, an "offer of proof", consisting of the facts which they believed they could establish, and the legal results which they held were required by such facts. The government then submitted comprehensive answering papers. Although the latter contained some supplemental statistical data, the government conceded the accuracy of most of defendants' factual materials. The United States strongly contested, however, the legal conclusions which the movants urged. With matters in this posture, this court set March 28, 1968, as the date for a final hearing. On that day and the next, the court heard evidence from twelve witnesses and oral argument of counsel. Both sides were then given additional time to submit final briefs, which were finally filed on May 6, 1968. The following shall comprise my findings of fact and conclusions of law.

I.

The jury system in this court was described at length in United States v. Van Allen, supra, 208 F.Supp. at 332–334, and earlier in United States v. Greenberg, supra, 200 F.Supp. at 382–386. Nevertheless, because the deposition of Mr. William Borman discloses that there have been some significant changes, and because clarity is best served if there is a description of the system within the four corners of this opinion, I deem it advisable to include such a description.

The core source of prospective jurors for both the grand and petit jury systems in this district is voter registration lists for the most recent Presidential election year. The registered voter population for the entire district is not, however, drawn upon; considerations of efficiency and economy have dictated use only of the lists for the assembly districts in Bronx and New York Counties, and for those towns in Westchester County which lie, roughly speaking, south of White Plains. Other sources of names have been used from time to time. Being overly generous to movants and looking back even as far as twenty years, however, these additional names came only from real estate listings, a phone book in one instance, and recommendations which came in haphazardly.[1] These sources never amounted to more than 5% of the qualification notices sent out. The use of real estate listings—the principal collateral source—ceased in the late 1950's; hence the impact of these additional sources, clearly negligible at the Van Allen interlude, has now become de minimis.

Postcards summoning prospective jurors to appear for a qualification interview are prepared by taking each fifth or tenth name from one of these lists. Each week, 500 such notices are prepared and sent out to a given Manhattan or Bronx assembly district, and 100 to one of the Westchester County towns. The lists are used in strict rotation, with no assembly district or town getting a further mailing until all the other source areas have been tapped.

Responses of one form or another are received on some 97% of the notices. This figure includes, however, a large number of notices which are returned by the post office as undeliverable. Exactly what percentage of the return is accounted for in this manner cannot be ascertained, however, as the jury clerk does not keep a record of such figures.

1. Despite movants' contentions, sources other than registration lists have not been a significant source of names since 1943. See United States v. Dennis, supra, 183 F.2d at 218.

Those people who appear in response to the notice are first interviewed by a deputy clerk. Each respondent is asked if he is aware of any factor rendering him unqualified or unable to serve. If the interviewee *sua sponte* asserts an exemption under state law, see New York Judiciary Law, McKinney's Consol. Laws, c. 30, § 599, and requests an excuse from jury service, the deputy clerk excuses him. This excuse, of course, eliminates this person from the jury system; he will not be called again unless by chance he receives another qualification notice. If the interviewee claims that jury service would entail financial hardship, the clerk, under current practice, will not disqualify him unless a clear showing of severe hardship is made. Instead, he will direct the person to present his plea, when he is actually called for service, to the Chief Judge or the Crime Part I judge. This marks a change from the practices employed in the period scrutinized in *Van Allen*. At that time, the deputy clerks possessed much broader discretion to grant hardship excuses by disqualifying a prospective juror.

A further change from the procedures passed upon in *Van Allen* is that the deputy clerks no longer selectively qualify individuals for either grand or petit jury service. This district has always operated with a split system, with one pool of prospective petit jurors, and another of prospective grand jurors. During the period scrutinized in *Van Allen* (1956–59), and undoubtedly before as well, the problem of allocating new prospective jurors to one system or the other was handled by the deputy clerk conducting the qualification interview. The decision turned exclusively on the convenience of the prospective juror. If an individual demurred to jury service on hardship grounds, he was frequently asked if grand jury duty, which entails a longer exposure, but only for part rather than all of each day, would be feasible. Additionally, if the grand jury wheel was low in a particular month, the clerks were instructed to

qualify more grand jurors. Towards that end, they would suggest to individuals the possibility of grand jury service, and inquire which type of service would be more convenient. At times, the clerks also qualified individuals for grand jury service without such inquiry, particularly when it was clear that the individual's occupation rendered grand jury service more convenient.

This procedure was abandoned sometime around 1960. Now, when additions to the grand jury system are necessary, they are principally supplied by random transfers from the petit jury list. Seven hundred names have been transferred in this manner since 1960. Additionally, a small number of grand jury replacements come from requests for transfer, and from transfers made because an individual's petit jury service record indicates to the deputy clerks that he is capable of serving for the longer periods required by grand jury service. Currently, Mr. Borman keeps the grand jury system at the level of 2,500 names, and the petit jury system at around 23,000 names.

If the interview does not result in the individual being excused, the deputy clerk gives the prospective juror a questionnaire to fill out. The questionnaire seeks, *inter alia*, the individual's address, age, occupation, educational attainments, and criminal record. At this stage in the qualification process, only those standards set out in 28 U.S.C. §§ 1861–1863 are used to disqualify. Significantly, the practice in recent years has been to effectively ignore the data elicited on the individual's education in making the qualification decision. Individuals who cannot properly fill out the questionnaire are deemed unable to suit a reasonable standard of literacy and are disqualified.

Mr. Borman was questioned at some length on the yield of qualified jurors which this system has produced. Necessarily, the manpower limitations in his office have not permitted the type of elaborate record keeping which would

give an accurate, sophisticated picture of the operation of each stage of the qualification process. The only records available are the numbers of qualified jurors yielded by each mailing to a source assembly district or town. These figures show yields of from 9 to 12 per centum, with the average yield between 11 and 12 per centum.

The questionnaires of qualifying prospective jurors are used to fill out history cards and wheel cards. The history cards are filed alphabetically; the wheel cards are collected in groups of 100 and placed in an inventory drawer. They are withdrawn, on a first-in, first-out basis, when additions to the petit jury wheel are necessary.

Mr. Borman's office keeps approximately 500 names in the master grand jury wheel and approximately 3,500 names in the master petit jury wheel. The cards in the master grand jury wheel principally are from one of two sources: (1) cards of veteran grand jurors, which are returned to the wheel two years after discharge from service; (2) cards recently transferred from the petit jury system. The cards in the master petit jury wheel come from four sources: (1) cards of veteran petit jurors, which are returned to the wheel three years after discharge from service; (2) re-transfers, on account of hardship, from the grand jury system; (3) cards of prospective jurors excused three months previously for hardship, without a date certain being set for service; (4) new cards, added in groups of 100 to keep the wheel filled to the desired levels.

Each month, a minimum of 100 cards are drawn for each grand jury panel desired; 900 petit jury cards are drawn, 450 being allocated to each half of the month. A list of the prospective grand and petit jurors drawn is then prepared (hereinafter called the "venires"). Summonses are sent out to the prospective grand and petit jurors. The grand jury summonses are returnable before the Crime Part I judge; the petit juror summonses are returnable in the jury assembly room.

On the return date for petit jury summonses, requests for an exemption or excuse may be and are made to the Chief Judge, a procedure which, for reasons lost in the mists of time, bears the unfortunate misnomer of "the Purge"! Inevitably, some requests to be excused are made in writing by summoned jurors to the jury clerk before the return date. These are directed, along with a suggested disposition, to the Chief Judge, who acts on them in due course. A similar process takes place before the Crime Part I judge with respect to the grand jury summonses. Frequently, the relief granted is either: (1) a "hold over", which amounts to the judge fixing a date certain when the individual will appear on a venire; or (2) a fixed date for returning the individual's card to the master grand or petit jury wheel.

Because of the excuse process, attrition in the lists from death and population movement, and whatever, about one-third of those summoned to serve each month prove available for service. This is true of both the grand and petit jury systems.

## II.

The discovery which the court permitted of jury records embraced the following items:

1. The grand jury venire lists for the past five years.

2. The history cards for the panels from which the grand juries which indicted the movants were selected.

3. The history cards for the petit jury panels summoned for October and November, 1967.

4. A sample of 100 questionnaires of November and October, 1967 petit jury panelists.

Utilizing this data, the movants were able to construct a picture of the operation of the grand and petit jury systems. They submitted numerous tables in support of their analysis. In my view, however, the most meaningful presentation

utilized demographic and census data to roughly categorize grand and petit jury veniremen by race, economic well being, and age. Selected assembly districts were used in the case of Manhattan and the Bronx; selected towns were used in Westchester. The parties stipulated to the racial and economic composition of the selected assembly districts and towns. In addition, testimony was elicited at the final hearing from various witnesses, as to the racial complexion of the neighborhoods in which the Westchester veniremen resided. This testimony was to the effect that very few of the names—usually only one or two—came from predominantly non-white areas. The government has stipulated that the composite figures are accurate. Although analyses were submitted for the grand jury venires from 1965 to 1967, only the 1967 figures will be set down herein. Both sides concede that these figures are representative, a concession amply borne out by the record.

The results of the above-described analysis are as follows:

## NEW YORK COUNTY
### (MANHATTAN)

#### GRAND JURY VENIREMEN
#### SELECTED IN 1967

| Assembly Districts | Percentage of 1964 Manhattan Registered Voter Population | Percentage of 1967 Manhattan Grand Jury Veniremen (1195 Names) | Veniremen (Names) per 10,000 Registered Voters |
|---|---|---|---|
| **Predominantly Negro & Puerto Rican Assembly Districts** | | | |
| 11th AD | 4.3% (30,531 persons) | 17/100 of 1% (2 names) | 0.7 |
| 14th AD | 3.6% (25,756 persons) | 50/100 of 1% (6 names) | 2.3 |
| 16th AD | 3.3% (23,209 persons) | 8/100 of 1% (1 name) | 0.4 |
| 11th, 14th & 16th Combined | 11.3% (79,496 persons) | 75/100 of 1% (9 names) | 1.1 |
| **Predominantly White Assembly Districts** | | | |
| 8th AD | 7.7% (54,664 persons) | 18.9% (226 names) | 41.3 |
| 9th AD | 8.0% (56,684 persons) | 39.2% (469 names) | 82.7 |
| 8th & 9th Combined | 15.7% (111,348 persons) | 58% (695 names) | 62.6 |

## BRONX COUNTY

### GRAND JURY VENIREMEN
### SELECTED IN 1967

| Assembly Districts | Percentage of 1964 Bronx Registered Voter Population | Percentage of 1967 Bronx Grand Jury Veniremen (295 Names) | Veniremen (Names) per 10,000 Registered Voters |
|---|---|---|---|
| Predominantly Negro & Puerto Rican Assembly Districts | | | |
| 4th AD | 4.1% (25,959 persons) | 1.0% (4 names) | 1.7 |
| 6th AD | 4.9% (30,058 persons) | 1.7% (5 names) | 1.5 |
| 4th & 6th Combined | 9.0% (56,017 persons) | 2.7% (9 names) | 1.6 |
| Predominantly White Assembly Districts | | | |
| 10th AD | 11.1% (67,682 persons) | 20.0% (59 names) | 8.7 |
| 12th AD | 13.0% (79,145 persons) | 19.7% (58 names) | 7.3 |
| 10th & 12th Combined | 24.1% (146,827 persons) | 39.7% (117 names) | 8.0 |

Note: The above figures are total names and thus include duplicates.

## WESTCHESTER COUNTY

### GRAND JURY VENIREMEN
### SELECTED IN 1967

| Town or City | Percentage of 1964 Westchester Registered Voter Population | Percentage of 1967 Westchester Grand Jury Veniremen (675 Names) | Veniremen (Names) per 10,000 Registered Voters |
|---|---|---|---|
| Cities with Substantial Negro Population | | | |
| Mount Vernon | 8.3% (35,680 persons) | 2.8% (19 names) | 5.3 |
| New Rochelle | 8.8% (37,471 persons) | 5.2% (35 names) | 9.3 |
| Yonkers | 23.9% (101,946 persons) | 6.2% (42 names) | 4.1 |
| Combined | 40.9% (175,097 persons) | 14.2% (96 names) | 5.4 |
| Towns without Substantial Negro Population | | | |
| Scarsdale | 2.4% (10,290 persons) | 21% (142 names) | 4.1 |
| Eastchester * | 4.5% (19,428 persons) | 10.3% (69 names) | 35.5 |
| Rye | 6.4% (27,355 persons) | 12.4% (84 names) | 30.6 |
| Combined | 13.4% (57,073 persons) | 43.6% (295 names) | 51.8 |

* The town of Eastchester includes Bronxville and Tuckahoe. The town of Rye includes Portchester.

## DISTRIBUTION OF MANHATTAN GRAND JURY VENIREMEN
## SELECTED IN 1967 BY CENSUS TRACT
## MEDIAN FAMILY INCOME

| Census Tract Median Family Income | Percentage of Total Manhattan Adult (Over 21) Population | Percentage of Veniremen Selected in 1967 |
|---|---|---|
| $ 3,000– 3,999 | 19.3% | 2.0% |
| 4,000– 4,999 | 21.2 | 4.1 |
| 5,000– 9,999 | 50.4 | 44.4 |
| 10,000–14,999 | 3.9 | 9.8 |
| 15,000–19,999 | 2.8 | 18.3 |
| 20,000 & over | 2.5 | 21.4 |
| | 100.1% | 100.0% |

## AGE DISTRIBUTION OF GRAND JURY VENIREMEN
## FROM THE VENIRES IN THE INSTANT CASES

| Age Group | % of Population in Manhattan,* Bronx, Westchester | Number of Veniremen | % of Veniremen |
|---|---|---|---|
| 21–29 | 20.6% | 5 | 1.3% |
| 30–39 | 23.8% | 31 | 8.1% |
| 40–49 | 20.4% | 55 | 14.3% |
| 50–59 | 17.6% | 110 | 28.5% |
| 60+ | 17.3% | 184 | 47.7% |

* From the 1960 Census. The percentages in the various age groups have not substantially changed since the 1960 Census.

## NEW YORK COUNTY

### PETIT JURY PANELISTS
### SELECTED FOR THE OCTOBER–NOVEMBER
### TERM OF COURT

| Assembly District | % of Registered Voters | % of 1967 Veniremen (657) |
|---|---|---|
| 11th AD | 4.3% (30,531 persons) | 1.1% (7 names) |
| 14th AD | 3.6% (25,756 persons) | 0.76% (5 names) |
| 16th AD | 3.3% (23,209 persons) | 0.76% (5 names) |
| Combined | 11.3% (79,496 persons) | 2.6% (17 names) |
| 8th AD | 7.7% (54,664 persons) | 13.5% (89 names) |
| 9th AD | 8.0% (56,684 persons) | 16.7% (110 names) |
| Combined | 15.7% (111,348 persons) | 30.2% (199 names) |

---◆---

## BRONX COUNTY

### PETIT JURY PANELISTS
### SELECTED FOR THE OCTOBER–NOVEMBER
### 1967 TERM OF COURT

| Assembly District | % of Registered Voters | % of 1967 Veniremen (477) |
|---|---|---|
| 4th AD | 4.1% (25,959 persons) | 2.9% (14 names) |
| 6th AD | 4.9% (30,058 persons) | 1.9% (9 names) |
| Combined | 9.0% (56,017 persons) | 4.8% (23 names) |
| 10th AD | 11.1% (67,682 persons) | 16.1% (77 names) |
| 12th AD | 13.0% (79,145 persons) | 15% (71 names) |
| Combined | 24.1% (146,827 persons) | 31.1% (148 names) |

## WESTCHESTER COUNTY

### PETIT JURY PANELISTS
### SELECTED FOR THE OCTOBER–NOVEMBER
### 1967 TERM OF COURT

| Town or City | % of Registered Voters | % of 1967 Veniremen (448) |
|---|---|---|
| Mount Vernon | 8.3% (35,680 persons) | 5.1% (23 names) |
| New Rochelle | 8.8% (37,471 persons) | 6.7% (30 names) |
| Yonkers | 23.9% (101,946 persons) | 12.3% (55 names) |
| Combined | 40.9% (175,097 persons) | 24.1% (108 names) |
| Scarsdale | 2.4% (10,290 persons) | 12.1% (54 names) |
| Eastchester | 4.5% (19,428 persons) | 9.2% (41 names) |
| Rye | 6.4% (27,355 persons) | 12.7% (57 names) |
| Combined | 13.4% (51,073 persons) | 34% (152 names) |

---

### AGE DISTRIBUTION OF PERSONS APPEARING ON
### PETIT JURY PANELS FOR THE OCTOBER–
### NOVEMBER 1967 TERM OF COURT

| Age Group | % of Adult Population in Manhattan,* Bronx, Westchester | Number of Persons on Panels | % of Total Persons on Panels |
|---|---|---|---|
| 21–29 | 20.6% | 37 | 4.5% |
| 30–39 | 23.8% | 118 | 14.4% |
| 40–49 | 20.4% | 237 | 29.1% |
| 50–59 | 17.6% | 225 | 27.6% |
| 60+ | 17.3% | 197 | 24.2% |

* From the 1960 Census. The proportions of the population in the various age groups have not substantially changed since the Census.

The parties also stipulated further facts with respect to the economic composition of the relevant assembly districts and towns: (1) that the median family income of the 11th, 14th and 16th Manhattan Assembly Districts is substantially lower than the median family income for all of Manhattan; (2) that the same is true of the 4th and 6th Bronx Assembly Districts with respect to the median family income for all of the Bronx; (3) that the median family income for Mt. Vernon, New Rochelle and Yonkers is lower than the median family income for all of Westchester; (4) that the median family income of the 8th and 9th Manhattan Assembly Districts is substantially higher than the median family income for all of Manhattan; (5) that the median family income for Scarsdale and Eastchester is higher than that for all of Westchester; and (6) that 25% of the persons whose names appear on the grand jury venires for 1967 are listed in one or more of Directory of Directors in the City of New York (1967), Poor's Registry of Directors, Who's Who in New York (1960), Who's Who in the U. S. (1967) and Social Register New York (1967).

### III.

The movants urge that the jury system for selecting petit and grand jurors is illegal, both under the Fifth Amendment[2] to the Constitution and pursuant to statute and federal common law promulgated under the supervisory powers. These contentions fall into two categories: (1) arguments addressed to the product of the system, and (2) arguments focused at various aspects of the machinery of the system. The arguments addressed to the product of the system are most strongly pressed, and will be considered first.

### A. Economic and Racial Imbalance

Movants argue that their statistics clearly show that the jury system operates to exclude Negro and Puerto Rican Americans, and also the economically disadvantaged. They state these arguments separately; however, as their proof itself reveals, the two contentions are two sides of the same coin. Essentially, movants are contending that this district's jury system operates to exclude the urban poor. At this juncture in our history, the close correlation between race and poverty in our urban centers is common knowledge and our common shame.

At the outset, it is important to note that movants conceded at oral argument that there is no issue here of purposeful discrimination against the urban poor or any other group. Despite some dark innuendos in their final brief, I do not understand them to be withdrawing this concession. In any event, I am persuaded that on this record no charge of overt discrimination can be made against the jury clerk and his deputies.

Nevertheless, movants contend that the system, as structured, operates to discriminate against the urban poor, and as such is impeachable constitutionally and as a matter of federal decisional law. The constitutional arguments need not be separately treated; the federal common law embraces and goes beyond the constitutional requirements in this area. United States v. Greenberg, supra, 200 F.Supp. at 387. See Fay v. New York, 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). Hence, if the system satisfies the greater rigor of the federal standard, the Constitution is also satisfied.[3]

---

2. No claim is asserted under the Sixth Amendment, possibly because that provision derives its content from history, and that history is not favorable to the contentions made herein. See United States v. Dennis, 183 F.2d 201, 216–224 (2d Cir. 1950) (L. Hand, J.), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

3. The Constitution prohibits systematic exclusions of racial groups, cf., Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) ; exclusions of other groups can

■■ The chief claim made is that exclusion of the lower socio-economic stratum of the community violates the dictate that the jury system must draw from a "cross section of the community", e. g., Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). This ageless shibboleth appears in every jury challenge case; as pointed out by Judge Learned Hand, however, the phrase, standing alone, is useless as a standard of decision. United States v. Dennis, supra, 183 F.2d at 224. The propriety of using some selective standards in culling veniremen from the mass of society is unquestioned. For example, it is clearly acceptable under present law not to send qualification notices to the citizens in this district residing north of White Plains. E. g., United States v. Kelly, supra, 349 F.2d at 779. See 28 U.S.C. § 1865(a) (1964). It is likewise acceptable to excuse potential veniremen on a showing of hardship, e. g., Thiel v. Southern Pacific Co., supra; indeed, it is settled that this dispensation may be granted at the qualification interview, despite the fact that this necessarily amounts to eliminating the individual from the system. E. g., United States v. Van Allen, supra, 208 F.Supp. at 337. These and other acceptable "selective criteria" [4] have the inevitable effect of detracting from the representative character of venires. Unavoidably, one must conclude that the phrase "cross section of the community" serves as little more than a starting point for analysis. Gross disparities in the representation of any identifiable group in the community of course serve to call scrutiny to the system. See Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L. Ed.2d 599 (1967); Norris v. Alabama, supra; [5] United States v. Cohen, 275 F. Supp. 724, 742 (D.Md.1967) (three-judge court). The crux of the inquiry, however, is whether the disparities are the product of proper procedures and standards of selection, see United States v. Flynn, supra, 216 F.2d at 378–389, affirming 106 F.Supp. 966 (S.D.N.Y. 1952); United States v. Dennis, supra, 183 F.2d at 216–224. At least this is so in a case like the present, where the core source of names for the system—voter registration lists—is beyond reproach. United States v. Kelly, supra, 349 F.2d at 778.

On this record, I find that the disparities relied upon by movants are almost completely the product of the hardship excuse procedures.

■■ As has been noted numerous times by commentators, jury service, particularly grand jury service, is a heavy burden. The $10 per diem stipend, 28 U.S.C. § 1871 (1964), is too

be unconstitutional, if a showing of unfairness in the particular case is made out. Fay v. New York, 332 U.S. 261, 292–293, 67 S.Ct. 1613, 91 L.Ed. 2043 (1946). Federal law has been held to prohibit exclusions which are not product of proper selective criteria. No showing of unfairness is required. E. g., Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

Movants must show that they are members of the allegedly excluded class to have standing to assert a constitutional claim. See Fay v. New York, supra, 332 U.S. at 287, 67 S.Ct. 1613. There is no comparable standing requirement to claim under federal law; any federal criminal defendant has standing to challenge the jury systems used or to be used in his case. E. g., Dow v. Carnegie-Illinois Steel

Corp., 224 F.2d 414, 422–423 (3d Cir. 1955) (en banc), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956). See United States v. Dennis, 183 F.2d 201, 216 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

4. E. g. the literacy requirement. 28 U.S.C. § 1861(2) (1964).

5. In this line of cases the Supreme Court, pursuant to its power to review factual determinations crucial to constitutional rulings, created a rule shifting the burden of proof to the state on a showing of significant racial disparity in state court venires. These cases have no applicability here, as the record clearly provides acceptable answers to the disparities revealed by statistics. United States v. Flynn, supra, 216 F.2d at 384. See United States v. Dennis, supra, 183 F.2d at 223.

often inadequate,[6] particularly in the cases of those prospective veniremen with family responsibilities. Perhaps of equal significance, so far as grand jury service is concerned, is the amount of time usually required. Grand jury service normally entails a minimum of one month's service, and a maximum of eighteen months' time; even where such service requires no more than several hours a day, it is particularly inconvenient for wage earners and median and low-level salaried employees. Moreover, it is of little significance that a substantial number of the larger public and private employers in this city continue to pay an employee who has been called and is actually serving as a juror. Absent a showing that this policy and practice is generally known, or has been publicized in such a way that it would likely be generally known by their employees, it cannot be inferred, as movants would have me do, that this laudable practice demolishes the significance of the hardship excuse procedures and results. There is no such evidence here; moreover, the experience of the undersigned with the "purge" process indicates that, at least with respect to employees of employers such as the City of New York, the commercial banks and the large financial houses, the availability of these benefits is not well known. In any event, I am persuaded that the hardship excuse, whether dispensed by a district judge in "purge" proceedings, or by a jury clerk at the qualification stage, explains in substantial measure the disparity in the representation of poorer citizens in this district. There is, of course, no objection to excusing prospective veniremen for hardship. Thiel v. Southern Pacific Co., supra, 328 U.S. at 224, 66 S.Ct. 984.

One further line of proof offered in this area by movants deserves comment.

In addition to the statistics and the expert testimony of Professor John De Cani, of which heretofore at least by implication I have indicated an unqualified acceptance, movants also introduced into evidence a single grand jury venire in Eastern District of New York for a period in 1967. According to witness Robert Moore, about 20 of the 67 veniremen were black citizens, and the remaining 47 were white citizens. This evidence, capped by the title "the lesson of Brooklyn", presumably teaches that this court must be doing something wrong, at least in comparison to our sister court in the Eastern District of New York. To me, however, the "lesson" is inconclusive. One venire list is hardly a fair and revealing comparison. To illustrate, in late February, 1963, the undersigned was confronted with a panel of 40 petit jurors, of whom 21 or 22 were black citizens and the balance white citizens.[7] Obviously, this panel, which was a coincidental product of the very system which movants here attack, cannot be regarded as a fair sampling of that system as a whole. The single venire in Brooklyn in 1967, although perhaps not precisely analogous to my example, is nevertheless at least as unfair and unrepresentative a "sampling" of the jury selection system in this court.

Understandably enough, movants press their attack on the grand jury system with the most vigor. They argue in this connection that the much more significant disparities in the representation of the urban poor in the grand jury system are attributable to the fact that grand juries are drawn from a separate, "stagnant" pool. In fairness to movants, it should be noted that this system is unique in the federal system. Beyond this, on purely pragmatic grounds, I confess to a lack of conviction that the

---

6. Present law allows the trial judge to increase the stipend to $14, but only when petit jury service in a single case has exceeded one month. 28 U.S.C. § 1871 (1964).

One of the most commendable features of the new Jury Selection and Service

Act is that the stipends are doubled. Jury Selection and Service Act of 1968, § 102, U.S.Code Congressional and Administrative News 688 (1968).

7. United States v. Andrew Walker, 61 Cr. 445, trial by jury on February 27, 28 and March 1, 1963.

present system is the most efficient and desirable one from either an administrative or public policy standpoint. Whatever the validity of this personal view, however, it has no reasonable relation to the issue of the legality of the system here attacked.

It is true that the population of the grand jury pool changes slowly; change comes about largely by attrition through death, illness and change of residence. Necessarily, a significant number of our current pool was chosen in the 1950's under selection methods then in vogue. An apparently representative segment of the additions during this period was scrutinized in *Van Allen*. As mentioned heretofore, the practice then was to selectively qualify individuals for either grand or petit jury service. But this practice, now discontinued, was merely a variant of the hardship excuse procedure, as it clearly appears that "convenience" of the individual prospective juror was the touchstone of decision. Moreover, the practice was questioned in *Kelly,* see Brief for Appellants Hagen and Kelly, pp. 40–42, United States v. Kelly, supra (Dk. No. 28018). The Court of Appeals, of course, affirmed in *Kelly*; even though it did not speak to the question, its action may be taken as implicit approval.

Movants argue, however, that because the grand jury pool is "stagnant", the list is tainted by allegedly illegal selective procedures employed even further in the past. Specifically, they claim that the list is tainted by the pre-1943 practice of relying on sources such as the Grand Jury Association and the Social Register for names. See United States v. Dennis, supra, 183 F.2d at 218. This argument has been made several times in the past and rejected, United States v. Dennis, supra, at 217–218; United States v. Van Allen, supra, 208 F.Supp. at 336. I am constrained to abide by those decisions. More particu-

larly, movants' contention that about 25% of the grand jury pool are persons listed in the Social Register, Who's Who in America, etc. is unconvincing because (1) there is no persuasive evidence that all or most of such persons were drawn from such sources, and (2) even if some were, they are incidental holdovers from a practice discontinued about 25 years ago. United States v. Flynn, supra, 216 F.2d at 379. The transcript in *Van Allen,* supra, which was made part of the record here, indicates that additions were frequently made to the grand jury pool in the period there under scrutiny. Moreover, the deposition of Mr. Borman taken in these proceedings reveals that some 700 names from voter registration lists have been added to this 2500 name pool since 1960.[8] Thus, I conclude that the characterization of the current grand jury pool as "stagnant" and, inferentially, selected by improper standards is overblown and unwarranted.

### B. Alleged Age Imbalance

The claim is also pressed that young adults are excluded from jury service in this district. Preliminarily, it must be observed that in this area movants' statistical evidence suffers from an obvious infirmity. Specifically, movants purport to show a disparity between the number of young adults [9] in the community, as indicated by the 1960 census, and those of this class cast up in the venires. Thus, such a comparison suffers the vice of ignoring that veniremen are selected from voter registration lists. To the extent that the age group complexion of these registration lists varies from the general adult population, movants' contentions are foreclosed by considerable case law. E. g., United States v. Agueci, 310 F.2d 817, 833 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Van Allen, supra; United States v. Greenberg, supra. Interestingly, there is express recogni-

---

8. In actuality, these names came from the petit jury list, which in turn came from voter registration lists.

9. As best as I can determine, movants would define "young adults" as persons between the ages of 24 and 40 years.

tion in some of these opinions that young adults are underrepresented in registration lists. United States v. Van Allen, supra, 208 F.Supp. at 335 n. 1; United States v. Greenberg, supra, 200 F.Supp. at 392. In short, the only relevant disparity would be between registered young adults and young adults on venires. Movants have offered no such evidence.

 Conceding *arguendo*, however, that young adults may be underrepresented on the venires, there is a cogent explanation for this in what the government has styled the "condition of youth." Brief of the United States, at 33. "It is * * * a matter of common knowledge * * * that many women in the younger age groups have responsibilities of care for young children, and that many persons of both sexes in the younger age categories are away from home at school, and in the case of men, in the military service." United States v. Cohen, supra, 275 F.Supp. at 740. Moreover, the overbalance of the grand jury system toward the older age groups is almost certainly a concomitant of the special burden of grand jury service and the hardship excuse procedures.

C. *Other Claims of Imbalance and Failure of the System to Produce a "Cross Section" of the Community.*

 Until the recent enactment of the Jury Selection and Service Act of 1968, U. S. Code Congressional and Administrative News, p. 678 (1968), 82 Stat. 53 (1968), which is not yet in effect, the federal statutes provided at best only the broad outlines of a jury system; considerable discretion existed and still exists in the judges of the various district courts to fashion machinery appropriate to the task of producing the required quantum of grand and petit jurors. Thiel v. Southern Pacific Co., supra, 328 U.S. at 220, 66 S.Ct. 984, 90 L.Ed. 1181; United States v. Greenberg, supra, 200 F.Supp. at 388. Movants argue that this discretionary power is circumscribed by a general duty

to promulgate a scheme which is reasonably capable of producing venires which mirror the class of eligibles as defined in 28 U.S.C. § 1861 (1964). They claim that their evidence of the product of the current system in this district convincingly shows that this court has breached this duty. Parenthetically, they also suggest structural changes which, in their view, would serve to cast up venires of the desired complexion. Chiefly, they advocate that (1) the separate pool for grand jurors be abolished, and (2) the jury clerk be instructed to send out more qualification notices to the ghetto areas, to compensate for the fact that the return and qualification rates from these areas are lower. In addition, they make what to me at least are vague recommendations that the hardship excuse process in some manner be tightened up. In fairness, however, I recognize that these recommended changes are incidental to and supportive of movants' basic assertion that this court has an obligation under federal decisional law to structure its system with the primary purpose of producing venires representing a "cross section of the community", and that this duty has been breached in this district.

 Primary reliance for this position is placed on Rabinowitz v. United States, supra, 366 F.2d at 56–60. Accord, Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 (3d Cir. 1955) (en banc), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956). Movants, however, are bound, as I am, by the previous decisions of this court and the Court of Appeals for this Circuit, there being no controlling Supreme Court authority. It has been held in a body of cases in this Circuit that the principal duty upon this court and its deputies in structuring a jury system is to avoid improper exclusion of identifiable groups within the community. United States v. Flynn, supra, 216 F.2d at 378–389, particularly at 388, affirming 106 F.Supp. 966 (S.D.N.Y.1952); United States v. Greenberg, supra, 200 F.Supp. at 386–387. See United States v. Bowe, 360 F.2d 1, 7 (2d

Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); United States v. Kelly, supra, 349 F.2d at 778.

In *Flynn*, the Court of Appeals considered an argument virtually identical to that made here. A challenge to the petit jury system was before the court; one of the grounds of attack was that "the responsible jury officials failed to employ methods which would insure representation of a cross-section of the community in the composition of the jury list." 216 F.2d at 378–379. Then Circuit Judge Harlan rejected this argument, reasoning that it was an attempt to require a species of proportional representation, which he found neither constitutionally required nor desirable from a policy standpoint. Hence, the court denied relief under the Constitution and, as well, refused to impose the requirement pursuant to its supervisory powers:

> "We need devote little time to this phase of the challenge, for it is palpably a plea for proportional representation, or at least something approaching it, which has never been a part of the Anglo-American jury system and, indeed, is repugnant to that ·system. * * * We observed in *Dennis*, and need only repeat here, that 'cross-section' means not proportional representation of all groups within the community but rather a fair sample, tempered and limited by the eligibility standards imposed upon the jury clerks by applicable federal and state laws * * *. And implicit in our decision there, as was stated by the District Court in the case before us, was a recognition that defendants have no vested right in any particular method of selection, so long as the resulting array be not the product of intentional and systematic discrimination. * * *

It is of course true that we are freer to review and revise the jury selection process in our own courts than we are when passing upon systems utilized in the state courts. * * * But we decline to use our power of supervision to create a system of proportional representation on federal juries, even if such a goal were attainable." 216 F.2d at 388.

■ In light of this authority, I must rule against the contention that a duty rested upon this court to promulgate a system with reasonable capacity to produce venires representative of a "cross section of the community".

### D. *Alleged Statutory Violations*

Remaining to be considered are several specific attacks upon certain aspects of this court's jury selection system, claiming violations of the federal statute. None of these claims requires extended discussion; in each case, a ready answer is found in either precedent or in the statute itself.

■ First, it is claimed that the practice of replenishing the jury lists or wheels in part with veteran jurors is in violation of the statutory edict that "the jury box shall from time to time be refilled * * *." 28 U.S.C. § 1864. If the only material available to assist in construing this requirement were the quoted statutory language, I would be inclined to rule against the suggested reading of "refill". The immediately preceding sentence in section 1864 mandates that a minimum number of 300 names be maintained in the box; the section itself is generally concerned with procedures for keeping the box filled to the minimum level at the time of each drawing. It seems clear that "refilling" only refers to keeping the proper number of names in the box, and in no way limits the clerk to using "new" names at each drawing. This conclusion is·enforced by the 1968 Act, which directs that the jury plan of each district provide for the periodic "emptying and refilling" of the master jury wheel. Jury Selection and Service Act of 1968, § 1863(b) (4), U. S. Code Congressional and Administrative News, p. 681 (1968). Thus, Congress conceived that language in addition to the word "refilling" was necessary when the desired end was to in-

sure the use of new names at each drawing where a refilling might be required.

 Even less compelling is the contention that the maintainance of a separate pool or wheel for grand jurors in this district violates the statutory requirement that prospective grand and petit jurors be drawn from "*a* box", 28 U.S.C. § 1864 (1964) (Emphasis added.) Movants suggested construction suffers from the vice of being overly literal. In promulgating the presently applicable statute, Congress was only concerned with random selection of venires and chose the simple device of picking cards from a container to implement this end. The statute, therefore, is satisfied where both grand and petit jury venires are selected at random from separate boxes —or from one box.

 Finally, it is suggested that the statistics alone require a finding that the jury clerks have used higher standards of eligibility in the qualification process than those set down in the statute, 28 U.S.C. § 1861–1863 (1964). Quite evidently, movants here are endeavoring to pose the question considered by the Court of Appeals for the Fifth Circuit in Rabinowitz v. United States, supra, 366 F.2d at 45–55, i. e. whether the statutory standards are minimal or exclusive standards. The question need not be decided in this case, however, as there is no support in the record for the allegation that general— i. e., extra-statutory—standards of intelligence and character are employed in the qualification process. The record is clear that, with one exception, the statutory standards are the only ones used. The exception is the practice of disqualifying an applicant who *sua sponte* asserts an exemption under state law, New York Judiciary Law § 599. I do not understand movants to question this practice; in any event, it has been heretofore scrutinized and approved by this court. United States v. Van Allen, supra, 208 F.Supp. at 336–337.

The motions must be and are denied. It is so ordered.