**UNITED STATES of America, Appellee,**

v.

**Fred FERNANDEZ, Appellant. No. 725, Docket 72–2299.**

United States Court of Appeals, Second Circuit.

Argued March 29, 1973.

Decided May 23, 1973.

L. Kevin Sheridan, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., and Howard J. Stechel, Asst. U. S. Atty., of counsel), for appellee.

Eleanor Jackson Piel, New York City, for appellant.

Before FRIENDLY, Chief Judge, LUMBARD, Circuit Judge, and THOMSEN,* District Judge.

FRIENDLY, Chief Judge:

Fred Fernandez has been tried before three juries in the District Court for the Eastern District of New York for the armed robbery of the First Federal Savings & Loan Association on the afternoon of December 24, 1970. At all three trials the Government's case rested almost entirely on identification testimo-

* Of the District Court for the District of Maryland, sitting by designation.

ny, there being no other significant evidence to connect Fernandez with the crime. At the first trial, before Judge Bruchhausen, the jury disagreed. On the second trial, before Judge Costantino, there was a guilty verdict, but we reversed the conviction because of "the combined effect of the error in admitting the [impermissibly suggestive] photographic identification testimony, in failing to give a cautionary instruction on the danger of misidentification and in requiring defense counsel to make her objections to the charge in the presence of the jury . . ." in clear violation of F.R.Cr.P. 30, United States v. Fernandez, 456 F.2d 638, 642 (2 Cir. 1972); familiarity with that opinion is assumed. The third trial took place before Judge Travia, and the jury again brought in a guilty verdict. Although the evidence was ample to justify this, we are reluctantly constrained to reverse because of what we think some jurors could well have considered partisan conduct by the judge on the core issue in the case.

## I. *Speedy Trial Rules*

■ Before taking up other matters we must deal with one contention of the defendant which, if correct, would invalidate not only the trial leading to the conviction under review but, in all likelihood, a subsequent one. This is that the government was not ready for retrial within the period stipulated by the Second Circuit Rules regarding Prompt Disposition of Criminal Cases. While Rules 3 and 6 require that, in cases where a defendant is detained, as Fernandez was, the government must be ready within 90 days "from the date when the order occasioning the retrial becomes final," in this instance March 17, 1972, defense counsel took the position, as she still does, that it was enough that the government be ready within six

months. Since Rule 3 provides simply *for discharge* of a defendant held in custody when the government is not ready within 90 days, and Rule 4 alone provides for *dismissal* of the charges against a defendant when the government is not ready within 6 months, rights based on the 90-day period were clearly waived. Rule 8. It further appears that during at least some of this time defendant was detained in state prison on an entirely separate offense, in which case the detention provisions of Rule 3 by their own terms do not apply.

■ The government announced its readiness for trial no later than July 7, 1972, less than four months after the order for retrial had become final. More than a month of this delay was excludable because of pretrial motions under Rule 5(a); indeed two such motions were heard on the very day when the government announced its readiness. While defendant argues that the government cannot claim it was "ready" when it had not complied with orders to turn over evidence, we have no reason to doubt that if in July the court had set the case for early trial, the government would have complied. Although the trial did not begin until November 8,[1] we thus find no violation of the Second Circuit Rules. We add, however, that there should be no such long interval between the filing of our order of remand and the fourth trial we are directing.

## II. *Place of Trial*

Another matter deserves discussion before we proceed to the point that we deem to require reversal. The District Court for the Eastern District of New York is authorized to sit not only at its headquarters in Brooklyn, but also in Mineola and Westbury, Long Island. 28 U.S.C. § 112(c). Judge Travia and Senior Judge Zavatt have sat regularly at Westbury.[2] The Individual Assignment

---

1. In July and August Fernandez was tried, convicted and sentenced in New York Supreme Court, Queens County, for assault on a police officer.

2. Judge Travia remarked during discussion of this aspect of the case that the authority to sit in Mineola has not been recently used.

and Calendar Rules for the Eastern District provide that cases shall be assigned to all judges on a random basis, with the result that the judges sitting at Westbury may be initially assigned a case where trial in Brooklyn would be more convenient. Under Rule 1.1(b), a criminal case may be designated as a "Westbury case" if the crime is alleged to have been committed in whole or in substantial part in Nassau or Suffolk counties or "if the interests of justice so require"; however, Rule 1.1(d) provides that "[t]he assigned judge shall have discretion to designate a case as a 'Westbury case' whether or not any of the parties desire such designation," and that such designation or the lack of it "does not require that judge to conduct proceedings in the case in whole or [in] part at any particular place."

■ The instant case having been assigned to Judge Travia in Westbury, defendant moved on March 28, 1972 for its reassignment to Brooklyn since the crime was committed in Queens County. We perceive no sound reason for the denial of the motion. There is not the slightest indication why "the interests of justice" required trial at a point 26 miles away from the headquarters of the court and the United States Attorney, and nearly that much further away from the office of defense counsel in Manhattan. According to Fernandez' affidavit on the transfer motion—not contradicted by the government in this respect—none of the principal witnesses lived in Nassau County or in a place to which Westbury, without public transportation, was easily accessible. So far as the record shows, the only person convenienced by trial at Westbury was the judge. Denial of the motion to reassign the case seems to have violated the second sentence of F.R.Cr.P. 18,[3] and we might well have reversed on this ground alone if defendant had been able to show any prejudice. While he made no attempt to do this except on the matter of jury selection, that and other claims relating to trial at Westbury should be discussed since they may create problems in future cases unless corrective measures are taken.

■ There is no merit in Fernandez' most extreme argument, namely, that by having been tried in Westbury rather than Brooklyn, he was deprived of rights under Article III, Section 2 and the Sixth Amendment of the Constitution, and under the first sentence of F.R. Crim.P. 18. Both the Sixth Amendment and the first sentence of Rule 18 speak of a right to trial in the *district* where the crime occurred; since the theft of which Fernandez was convicted occurred in Queens, in the Eastern District of New York, trial in Westbury, in Nassau County, a county adjacent to Queens and within the District, rather than in Brooklyn, the headquarters of the Eastern District, does not offend the terms of these venue requirements. Indeed, Rule 18 was amended in 1966 to eliminate an earlier requirement that the trial take place in the district *and division* where the crime occurred. The Advisory Committee suggesting the change relied on dictum in Supreme Court opinions indicating that trial within the district but not within the division was constitutionally permissible, see United States v. Anderson, 328 U.S. 699, 66 S. Ct. 1213, 90 L.Ed. 1529 (1946), on which lower federal courts have also relied, see Lafoon v. United States, 250 F.2d 958 (5th Cir. 1958); United States v. Partin, 320 F.Supp. 275 (E.D.La.1970). It follows *a fortiori* that when a district is not separated into divisions, like the Eastern District of New York, trial at any place within the district is allowable under the Sixth Amendment and the first sentence of F.R.Cr.P. 18.

■ However, satisfaction of this rather simple requirement need not pre-

---

3. "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses."

clude further inquiry into the propriety of what was done here. In its most extensive discussion of the venue requirements of the Sixth Amendment, United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236 (1944), the Supreme Court has suggested a number of principles and policies embodied therein.[4] Two of these—that the provision avoids "the unfairness and hardship to which trial in an environment alien to the accused exposes him," United States v. Johnson, *supra*, 323 U.S. at 275, 65 S.Ct. at 250; see also United States v. Cores, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed. 2d 873 (1958), and prohibits "prosecution remote from home and from appropriate facilities for defense," United States v. Johnson, *supra*, 323 U.S. at 275, 65 S.Ct. at 250; are somewhat undercut by clear holdings, compelled by the constitutional text, that trial must be in the district where the crime is committed rather than in a different one where the defendant resides. Platt v. Minnesota Min. & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); United States v. Bithoney, 472 F.2d 16, 22 (2 Cir. 1973).[5] However, a third policy enunciated in *Johnson*—that too great leeway in the selection of a situs for trial "leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution," 323 U.S. at 275, 65 S. Ct. at 250, is pertinent to the trial at issue here, particularly since, this being a federal trial, we are not limited to the confines of the Sixth Amendment but

can exercise our supervisory power, see Ballard v. United States, 329 U.S. 187, 192, 67 S.Ct. 261, 91 L.Ed. 181 (1946). The holding of a criminal trial, over the objection of the defendant, in a place removed from the court's headquarters, having no relation to the place of the crime, and for no apparent reason other than the convenience of the judge, may "[lead] to the appearance of abuses," and this is heightened by Fernandez' points concerning the selection of the jury to which we will now refer.

Prior to the interrogation of the veniremen on *voir dire*, Fernandez moved —apparently pursuant to 28 U.S.C. § 1867(a) [6]—to have testimony on the procedures used in selecting the array. Thereupon the Jury Clerk for the Eastern District of New York was called and testified at some length but, as will appear below, without great clarity, about the District's system in selecting and calling the venires. Following this testimony Fernandez offered to present witnesses who would testify concerning the ethnic, economic and age characteristics of the population affected by the selection procedures. This offer of proof was denied by the judge with the statement that he "could almost take judicial notice of [this] fact. All you do is look at the census reports, the last census reports of 1970 will give you those figures."

■ We think this denial was illadvised.[7] If the judge meant, which he hardly could have, that a reading of the

---

4. See, however, the statement by Mr. Cipes that "[a]lthough the results of [the] Supreme Court decisions may be reconciled, the statements of constitutional policy obviously cannot." 8 Moore, Federal Practice ¶ 18.02 [2] (1972).

  For an interesting discussion of the history of the Constitutional Convention's consideration of the vicinage requirement, see Williams v. Florida, 399 U.S. 78, 93–97, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

5. This is explained by Mr. Cipes as follows: "At the time the Constitution was written, [the locus of the crime] would normally coincide with the place of defendant's residence. The framers could not

have contemplated a society with the mobility and complexity of ours, and the almost infinite variety of acts which have become criminally sanctioned." *Id.*

6. The challenge provisions of 28 U.S.C. § 1867(a)-(c) are made exclusive by 28 U.S.C. § 1867(e).

7. Although defendant's counsel may not have been entirely prepared to fulfill her offer of proof, in matters of such importance the court should not be inflexible in allowing continuances or other modifications of trial procedure in order to allow exploration of reasonable claims of improper jury selection procedures. 28 U.S.

Census figures would show the defendant's contention was necessarily without merit, we could not agree; as shown below, they indicate rather strongly that racial disparities were at least a possible outcome of the selection procedures. Further, under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq., a number of possible challenges to the jury selection system could not be answered merely by reference to the racial composition of the district and to the procedures used.

■ The process for selecting veniremen under the Eastern District's Jury Selection Plan,[8] as it appeared from the testimony of the Jury Clerk, was as follows: The names of registered voters in the Eastern District are entered upon computer tape. From this list the computer regularly retrieves on a random basis a designated number of prospective veniremen. These are then sent questionnaires advising them of their duty to serve on a future petit jury. Initially, those who live more than 25 miles from the Federal Courthouse in Cadman Plaza, Brooklyn, are allowed, upon request, an automatic deferral on the basis

of hardship.[9] Subsequently, when a trial is set for Westbury, jurors not already so deferred or otherwise excluded are allowed another chance at automatic deferral upon request if their residence is more than 25 miles from Westbury. Thus, if we understand the testimony of the Jury Clerk, this series of cumulative deferment allowances reaches the anomalous result that in Westbury trials the only area in which jurors are not allowed an automatic deferment on the basis of distance is, not a circle with a 25-mile radius from Westbury, but rather the area within two intersecting arcs encompassing towns within 25 miles of *both* Westbury and Cadman Plaza.[10]

Federal policies of fair and impartial jury selection procedures were most eloquently stated in Thiel v. Southern Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946):

The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. [citations omitted] This does not mean, of course, that every

---

C. § 1867(a) allows a defendant seven days after discovery of such improper procedures to move for dismissal of the indictment or a stay of proceedings.

8. 28 U.S.C. § 1863(a) provides that "[e]ach United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objections of sections 1861 and 1862 of this title . . . ." Such a plan was devised by the judges of the Eastern District, and placed into operation subsequent to approval of the Judicial Council on September 12, 1968.

The Jury Selection Act provides no mechanism for direct judicial review of the success or failure of a plan to achieve the objectives of the title. Rather, 28 U.S.C. § 1867(a) provides that the defendant in a criminal case may move to stay proceedings against him or to dismiss the indictment if there has been "a substantial failure to comply with the provisions of this title in selecting the grand or petit jury." On such a motion, the prior approval by the judicial council of the Plan does not bar subsequent judicial review of

the possible inadequacies of the Plan. See United States v. Hyde, 448 F.2d 815, 830 n. 23 (5 Cir. 1971).

9. Such "hardship" excuses based on distance from the courthouse are allowed by 28 U.S.C. § 1863(b)(7).

10. In understanding that two cumulative hardship excuses are allowed we may have been misled by the unclear presentation of the Jury Clerk and the haphazard questions put to him. As indicated in the text, if we have understood him correctly, a prospective venireman living in Westbury could be excused from sitting in a Westbury trial on the ground that he lived more than 25 miles from Brooklyn! However, if we are wrong about that and only a single hardship excuse based on distance from Westbury alone is allowed, this would tend to exacerbate the problem of racial disparities between Brooklyn and Westbury panels, discussed below, since an even higher relative percentage of prospective veniremen would come from counties with a low incidence of non-white residents. See note 14 *infra*; but see note 15 *infra*.

jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

■ Such language—in particular the phrase "cross-section of the community" —is helpful only as a description of rather than a solution to the problem of determining which jury selection *procedures* are permissible and which are not. On the one hand, it is clear that a criminal defendant in a federal court has no right to an individual panel represented by any particular racial, social, or eco-

nomic group. United States v. Dennis, 183 F.2d 201, 224 (2 Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Nor does one have a right to exact "proportional representation" in the array, United States v. Flynn, 216 F.2d 354, 388 (2 Cir. 1954) (Harlan, J.). And use of certain valid "selective criteria" [11] may "have the inevitable effect of detracting from the representative character of venires." United States v. Leonetti, 291 F.Supp. 461, 474 (S.D.N.Y.1968). On the other hand, the Jury Selection and Service Act goes beyond prohibition of "intentional" distortions and provides that in certain cases affirmative measures must be undertaken to insure that "juries [are] selected at random from a fair cross section of the community . . . ," 28 U.S.C. § 1861, 1863(b)(2); H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong & Adm.News, pp. 1792, 1794.[12] A determination whether the procedures here used sufficiently implemented the goals mandated by the Act, or evidenced signs of improper distortions in selection of the venires, could not have been adequately made without hearing additional testimony concerning the statistical composition of the popula-

11. "Qualifications" for jury service are provided in 28 U.S.C. § 1865. However, 28 U.S.C. 1863(b)(5), (6) provide for "exemptions" for certain classes or groups of otherwise qualified prospective veniremen.

12. In particular, 28 U.S.C. § 1863(b)(2) provides that while "voter registration lists or the lists of actual voters of the political subdivisions within the district or division" shall be used as the basic source of names for the venires, this source shall be supplemented by other sources "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title"— notably, that juries be "selected at random from a fair cross section of the community". This was explained by the House Judiciary Committee which reported on the bill in the following language: "The bill requires that the voter lists be supplemented by other sources whenever they do not adequately reflect a cross section of the community. The bill, as amended, provides that sources of names other than

voter lists may be used to *supplement*, but not *supplant*, voter lists". 1968 U.S.Code Cong. & Adm.News, p. 1794 (emphasis in the original). Whether such affirmative measures are necessary only when there is evidence of "systematic discrimination" in the composition of the voting lists or also when voluntary voting patterns create a statistical deviation from the cross-section of the community seems to have created a difference of opinion among courts which have considered the problem. Compare this court's decision in United States v. Guzman, 468 F.2d 1245, 1247–1249 (2 Cir. 1972) (statistical underrepresentation of 24-to-30 year olds on voting lists permissible since no bar to entry on lists) and United States v. James, 453 F.2d 27, 29 (9 Cir. 1971) (mere allegation of absence of blacks and poor people from panel selected from Oregon voter registration lists insufficient), and United States v. Arnett, 342 F.Supp. 1255 (D.Mass.1970) (dictum), with Broadway v. Culpepper, 439 F.2d 1253, 1254–1255 (5 Cir. 1971) (dictum).

tion and of the venires. Although our disposition of this appeal on other grounds makes it unnecessary for us to determine whether the judge's refusal of the offer to introduce such proof would itself be reversible error, we would not wish to be understood as approving his decision not to hear evidence that might have a bearing on this problem.

In particular, it seems to us that the combination of the Eastern District's system of hardship allowances and of the holding of certain trials in Westbury rather than Brooklyn may well lead to departures from the prescriptions of the Jury Selection and Service Act. Hardship allowances based on distance from the courthouse are not in themselves suspect selection criteria. United States v. Kelly, 349 F.2d 720 at 778–779 (2 Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Leonetti, supra, 291 F.Supp. at 474.[13] However, an excuse procedure based on distance, reasonable though this may be from the standpoint of the prospective juror, will have the inevitable effect of tending to concentrate the representation on the venire of those living relatively close to the courthouse.[14] Although this may be without legal consequences when veniremen are selected for a single courthouse within a division or district, see United States v. Leonetti, supra, or when court is held in several places and cases are assigned because they rationally belong there, a more difficult problem is presented when the place of trial—and thus the area of likely concentration in the selection of a venire—is moved from its normal site, over objection, apparently for the sole convenience of the judge. Furthermore, our reading of the gross census figures for the counties involved indicates that the impact of the move to Westbury on the relative incidence of representation of non-white minorities might well have been significant.[15] While the statistical significance and the legal relevance of the selection process cannot be adequately explored on this

13. The House Report on the Act indicates that its sponsors, by listing certain grounds for exemptions and excuses, wished to avoid "the casual granting of excuses" and the resultant distortion of the community cross-section. 1968 U.S. Code Cong. & Adm.News, supra, at 1797.

14. A study made in 1968 by the Office of Legal Counsel of the Administrative Office of the United States Courts indicates that at that time no other district in the United States allowed automatic hardship excuses for distances so small as 25 miles. Etters, A Critique of the Excuse Structure of the District Plans for Random Jury Selection (1968).

Although the fact that a particular venire contains uneven representation of a given racial, economic or social group is of no significance if the procedures used did not tend to cause the disparity, United States v. Dennis, supra, and we fully recognize that "one venire list is hardly a fair and revealing comparison," United States v. Leonetti, supra, 291 F.Supp. at 475, we note that of the 27 veniremen interrogated during the voir dire in this trial only two were from Brooklyn, the most populous county in the Eastern District. The county representation of those questioned was as follows:

Staten Island ..................... 1
Kings (Brooklyn) ................ 2
Queens ......................... 8
Nassau ......................... 13
Suffolk ......................... 3

15. The 1970 Census figures reveal the following racial configurations. The figures in parentheses indicate relative percentages.

| County | Total Pop. | White | Non-White |
|---|---|---|---|
| Kings | 2,602,012 | 1,905,788 (73.25) | 696,224 (26.75) |
| Queens | 1,986,473 | 1,695,288 (85.34) | 291,185 (14.66) |
| Nassau | 1,428,080 | 1,355,754 (94.94) | 72,326 (5.06) |
| Suffolk | 1,124,950 | 1,066,429 (94.80) | 58,521 (5.20) |

record,[16] "the appearance of abuses, if not . . . abuses, in the selection of what may be deemed a tribunal favorable to the prosecution," United States v. Johnson, *supra,* enhances our disfavor toward the decision to conduct this trial at Westbury over defendant's objection. We earnestly suggest that the questions canvassed in this section of the opinion, which we have found unnecessary here to decide, receive the immediate attention of the judges of the Eastern District.

### III. *The Conduct of the Trial*

In order to place the issue of the judge's conduct of the trial in its setting, it is necessary to summarize the evidence with respect to the identification of Fernandez as one of the robbers, since the issue was even more closely contested at the third trial than at the second. Indeed, defense counsel asks that, in the light of the new evidence presented, we reconsider this court's previous ruling that the impermissibly suggestive photographic identification did not preclude the bank employees from making an in-court identification at a retrial, 456 F.2d at 642–643.

Our ruling was based in considerable part on what seemed a strong resemblance between a photograph of Fernandez taken after his arrest on February 18, 1971, and the robber shown in the photographs by the bank's surveillance camera as standing on the bank floor, near a sign announcing that the bank would be closed on December 25 and an American flag—despite the fact that the surveillance photographs disclosed only the left side of the robber's face. The main point advanced against this at the second trial was that the robber in the surveillance photographs appeared to be at most of medium height, as several bank employees had said, whereas Fer-

nandez was 6' tall. This was what made it important for the defense to have "material allegedly in the Government's files showing the dimension of the interior of the bank so as to permit a calculation of the height of the man wearing the dark pea jacket in the surveillance photographs." 456 F.2d at 643 n. 4. At the third trial both sides adduced expert evidence on this issue. The government's witness was Special Agent Webb of the F.B.I., with many years of experience in the examination of bank surveillance films. Starting from the apparently conceded premise that the angle at which the surveillance camera was positioned would necessarily distort heights as they appeared in photographs, he testified that by superimposing photographic transparencies of various frames of the surveillance film onto other frames and comparing other individuals of known height shown in the film in the same position relative to the camera as the robber in the pea jacket, he could estimate the height of the robber as between 5' 10" and 6' 2". He also testified that the shape and contours of various facial characteristics of the robber shown in the surveillance photographs as wearing the pea jacket and cap and the set of the pea jacket with respect to the neck and shoulders were identical or wholly consistent with those in Fernandez' post-arrest photograph. To counter this impressive testimony the defense called William Vandivert, an experienced professional photographer, who was allowed to testify as an expert in identification after lengthy interrogation by counsel and the court into his qualifications. Using a process similar to that employed by Webb, Vandivert superimposed a transparency of a bank official whose height was variously determined to be 6' or 6' 2" over the surveillance photographs of the robber in the dark

16. For instance, we have here cited only gross, county-by-county statistics available in the 1970 Census. It might be demonstrated at a trial that areas affected by the 25 mile limit beyond which veniremen are allowed an automatic excuse from

service do not, in fact, contain high densities of non-white population, in which case a tendency to diminish the representation of those areas would not tend to lower the incidence of non-white jurors on Westbury panels.

pea jacket, and attempted to demonstrate that the robber was six inches shorter than the official. Vandivert also compared observable facial characteristics appearing in the surveillance photographs of the alleged Fernandez, including the shape of the nose and the lips, and concluded that they differed markedly from the characteristics appearing in police photos of Fernandez.

The other new evidence on identification at the third trial was this: At the second trial the government had offered a number of photographs excerpted from the surveillance film, which as now appears, had been cropped in such a way as not to reveal clearly the position of the alleged Fernandez relative to the desks of the two identifying bank employees, Mrs. Kalata and Mr. Pesch. At the third trial, after having finally obtained from the government on the eve of trial what is claimed to have been an exceedingly poor copy of the surveillance film, defense counsel subpoenaed from the Holmes Detective Agency a better copy which was displayed to the jury and which this court witnessed in the presence of counsel. In hundreds of frames this film shows a minute and a quarter of the robbery, starting at some indeterminable time after the robbers had entered the bank and ending as the robber identified as the defendant backed out of the camera's range while he covered the flight of the three other robbers. The point strongly urged by defense counsel is that whereas Mrs. Kalata and Mr. Pesch had been certain that the robber identified as Fernandez was standing immediately in front of Mrs. Kalata's desk, save for a brief interval when he moved toward the middle of the floor, the surveillance film shows the robber identified as Fernandez always in the middle of the floor until his exit and no one else in that position. The government's response was that the camera had not gone into operation at the

beginning of the robbery (as was evidently true, since the first frame shows two of the robbers already busy behind the tellers' windows), and, implicitly, that while Mrs. Kalata and Mr. Pesch may have been overly positive in their recollection how long the robber they identified as Fernandez had remained near Mrs. Kalata's desk, this was a matter for the jury. Although we adhere to our ruling that the impermissibly suggestive photographic identification did not give rise to such a "substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U. S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), as to prevent Mrs. Kalata and Mr. Pesch from making a valid in-court identification and will not do so on a new trial,[17] the introduction of the complete surveillance film and other possible inconsistencies in their testimony, to be discussed below, raised sufficient doubt about their testimony to convert what we had regarded as a rather clear case for the government, see 456 F.2d at 642, into a considerably closer one. This made it peculiarly necessary that the trial judge should not put the weight of his authority in the scales against the defense.

The defendant's criticisms are of two sorts—a general claim that the judge participated unduly in the conduct of the trial, and a more particularized one that, especially by his treatment of the defense expert, Vandivert, he telegraphed to the jury his adverse view on central issues in the case.

Although on the former issue defense counsel places primary reliance on United States v. DeSisto, 289 F.2d 833, 834 (2 Cir. 1961), she has furnished no statistics of the number of questions directed to witnesses by counsel and by the judge such as were there presented. We have not undertaken to perform that task for the trial as a whole; numbers alone do not furnish a "handy tool with

17. But for the excellence and clarity of the surveillance photographs we might have a different case. These photographs served, far better than a mere mental image, as the recollection of what the witnesses had seen.

which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant." United States v. Nazzaro, 472 F.2d 302, 304 (2 Cir. 1973). Compare United States v. McCarthy, 473 F.2d 300 (2 Cir. 1972). Although some of the judge's questions were clearly for the purpose of clarification, this rubric does not cover a number of his interventions. Among these were his examination which minimized the testimony of Patrolman Arena, whom the defense had called to show that the bank manager, O'Connor, had given 5' 6" as the height of the robber identified as Fernandez; his lengthy, and wholly unnecessary, additions to the government's cross-examination of defendant's alibi witnesses Chasson and Roper; and his similar addition to the cross-examination of defense witness Villalobos.[18] Before any of these incidents had occurred, the extent of the court's questioning during the prosecution's case led the Assistant United States Attorney to remark, on one occasion when a government witness had been turned over to him for direct questioning, that he would proceed "unless the Court would prefer to question him." Even if the Assistant's remark was jocular, the impression of some sort of partnership between the prosecution and the judge was unmistakable. Moreover, although the judge declined the invitation to begin the interrogation, after the Assistant had examined the witness to the extent of two pages of the transcript the judge took over for another thirteen.

The episodes thus far recited do not jibe with our notion of the proper role of a federal judge in a criminal trial. The Supreme Court noted long ago that "under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 341 (1894). Even if the judge thinks the performance of the Assistant United States Attorney has been inadequate, and we do not suggest here that it was, it is not his business to step in; there is too much danger that the jury will regard him as associated with the prosecution and be swayed accordingly. As Judge Learned Hand observed in United States v. Marzano, 149 F.2d 923, 926 (2 Cir. 1945), while the judge may examine witnesses, or occasionally even call them, "he must not enter the lists." See also Jackson v. United States, 117 U.S.App.D.C. 325, 329 F. 2d 893, 894 (1964).

However, we need not face the hard question whether these incidents would demand reversal if they stood alone. What tips the scale is the judge's treatment of the defense expert Vandivert. Although this portion of the record needs to be read in its entirety to appreciate the full flavor of the judge's seeming antagonism, we must be content with the extracts quoted in the appendix. While on one or two occasions the judge seems to have taken over the questioning in order to head off browbeating by the Assistant United States Attorney, whom he urged to cool off, and although Mr. Vandivert did not always give as direct answers as might have been desirable, it is impossible not to fear that the judge's repeated, lengthy and occasionally angry interventions [19] gave at least

18. Miss Villalobos was called to testify that, in an early phase of the investigation, FBI Agent Sweeney had attempted to pressure her into identifying the light skinned black in the surveillance photographs as her brother Arthur Teare. Her direct and cross-examination had taken six pages of the transcript; the court's took ten. This led to another question by the prosecutor, and six more pages of totally unnecessary examination by the court.

19. On cross-examination the judge asked 112 questions as against the prosecutor's 133. The six questions asked by defense counsel on redirect were followed by 103 questions from the court which can only be characterized as recross-examination. The government's recross was then limited to two questions.

some jurors the impression that he considered the testimony unworthy of belief. The judge's questioning of Vandivert is quite reminiscent of the kind of interrogation which we held to require reversal in United States v. Brandt, 196 F.2d 653 (2 Cir. 1952) (Clark, J.), despite a contention by the government that all was cured by the standard charge that the jury's own view of the evidence controlled. In United States v. Curcio, 279 F.2d 681, 682 (2 Cir. 1960), Judge Clark again reminded that a federal judge not only "must not interfere for a merely partisan purpose"; he must not "permit even the appearance of such an interference." While we held in *Curcio* that the judge cured any excesses by his repeated admonitions to the jurors of their responsibilities, we have become increasingly sensitive to the danger that jurors may "have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." United States v. Guglielmini, 384 F.2d 602, 605 (2 Cir. 1967); see also United States v. Grunberger, 431 F.2d 1062, 1067–1068 (2 Cir. 1970). Compare Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355, 365–368 (1957). If there is an uneasy tension between the principle that the judge may not appear to assume the role of an advocate and Sir Matthew Hale's extolling the ability of the common law judge to give the jury "his opinion even in matters of fact," History of the Common Law, 291–292, quoted in Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), see 8 Moore, Federal Practice ¶ 30.09 (1972), Chief Justice Hughes' opinion in *Quercia* indicates it is the latter that must yield. As was there said, the judge must conduct the trial "in conformity with the standards governing the judicial office"; he "may analyze and dissect the evidence, but he may not either distort it or add to it." 289 U.S. at 470, 53 S.Ct. at 699. Whatever may have been true in Sir Matthew Hale's time, we doubt that a guilty verdict rendered after the judge had told the jury that he considered a defense witness an unmitigated liar would be sustained by the Supreme Court today. When a judge interrupts the testimony of an important defense witness or interrogates him in a manner reflecting the judge's disbelief to the extent that was done with the witness Vandivert, he is departing from the standard laid down in *Quercia* for the conduct of criminal trials. The superimposition of this upon the incidents we have previously noted and others, while not so egregious as in United States v. Nazzaro, *supra,* 472 F. 2d at 310–313, demands a new trial if the high reputation of federal criminal justice and the policy of complete and even-handed fairness for the defendant are to be maintained.

## IV. *Other Points*

Of the many additional points of error claimed by defense counsel, it is necessary to consider only those that are likely to affect the next, and what we devoutly hope will be the last, trial.

■ (1) On January 18, 1971, Special Agent Sweeney of the F.B.I. had made an affidavit in support of an arrest warrant which averred that "two unrelated individuals" had identified three of the perpetrators shown in the surveillance photographs as Jerome Reide, Arthur N. Teare and Horsun Howard. Teare was a light skinned black; his photograph was included in an array of five pictures submitted to bank employees on January 25, 1971, with negative results, see 456 F.2d at 641–642. In a pretrial motion defense counsel requested that the government be compelled to disclose the names of the two individuals. The government opposed on the ground that the individuals would be in grave jeopardy if their names were disclosed, and the court refused to compel disclosure. Defendant contends this violated the teaching of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and our holding in United States ex rel. Meers v.

Wilkins, 326 F.2d 135 (2 Cir. 1964), that it was a violation of due process for a prosecutor to fail to turn over to the defense the affidavits of witnesses to a robbery that they had viewed Meers at police headquarters shortly thereafter and positively stated he was not one of the participants.

For several reasons, we do not regard *Meers* as applicable. The persons whose statements were withheld in *Meers* were witnesses to the crime, not persons who had made an identification from photographs, and there was no assertion that disclosure involved any danger to them. The persons who identified the light-skinned black robber as Teare were in the status of informers who had already positively identified two of Fernandez' co-defendants from the surveillance photographs. In the face of the government's claim of danger to them from a disclosure of their identity, the case called "for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L. Ed.2d 639 (1957). Here Fernandez has made no contention that Teare was one of the robbers; indeed, comparison of Teare's picture and the surveillance photographs would suffice to dispel this. The claim is not that the two unnamed individuals would stick to their identification of Teare and thereby exculpate Fernandez but rather that their presence as witnesses would permit the defense to develop that since two people erred in saying that the light-skinned robber was Teare, Mrs. Kalata, Mr. Pesch and the government expert, Mr. Webb, may have erred in saying he was Fernandez. Since the defense is already in a position to do this, sufficiently although perhaps not quite as effectively, by examining Sweeney, the prejudice arising from the nondisclosure of the informants' identities is relatively slight.

(2) Agent Sweeney had made up from the surveillance pictures an exhibit of isolated views of each of the four robbers. On direct examination, the prosecutor asked him to "put the name of each individual above that picture." When defense counsel objected, the court asked "Those are pictures of four people you know to be people whose names you put on?" and, on receiving an affirmative answer, allowed the witness to write the names, including Fernandez', above the photographs, received the exhibit in evidence, and allowed it to be shown to the jury. This was clear error since Sweeney had no personal knowledge and his statements were thus pure hearsay. Nor had he been allowed to testify as an expert qualified to compare the surveillance photographs with known photographs of Fernandez. Very likely the jury took this into account, but the error should not be repeated on the new trial.

(3) Defense counsel objected, on grounds of irrelevancy and prejudice, to the court's receiving in evidence the .45 fully loaded automatic pistol and ammunition, the pea coat, and $480 in bills found on Fernandez' arrest, see 456 F.2d at 639. The objections to admissions of the gun, the ammunition and the pea coat are plainly without merit. Admission of the bills is a closer question. Forty-seven days had elapsed between the bank robbery and the arrest, and Fernandez claimed, although not very persuasively, that he had earned the money. While the evidence had some minimal relevancy, that is not the end of the inquiry, since there was a substantial possibility of prejudicial impact on the jury. Our own answer to the further question, "Is its value worth what it costs," McCormick, Evidence 438–39 (1972 ed.), would differ from the trial judge's.

(4) Although defense counsel had not previously challenged the validity of Fernandez' arrest, see 456 F.2d at 639, as distinguished from the search and seizure, she now does so. The attack could well be regarded as untimely under F.R.Cr.P. 41(e), especially since the lapse of time has caused the government to be unable to locate the affidavit

supporting the arrest warrant. Although the prime purpose of the Rule is to avoid the interruption of trials, its letter goes beyond this and it is reasonable to demand that attacks on an arrest and an incidental search and seizure should be made before recollections have become too dimmed and documents have been lost. In any event invalidity of the arrest is arguably without consequence in view of our holding, 456 F.2d at 640, that Mrs. Fernandez consented to the entry and search; although the consent came after the seizure of the ammunition, the bills and the pea jacket, it was broad enough to include these. Finally, Sweeney's testimony that three informants of previous reliability, in addition to Arthur Teare,[20] had identified Fernandez from the surveillance pictures constituted probable cause.

■ (5) Defense counsel makes the standard objection that the government expert Webb should not have been allowed to express an opinion on the "ultimate" issue of identity which was to be decided by the jury. Any such rule has long since been abandoned, for reasons stated in 7 Wigmore, Evidence § 1920–21 (3d ed. 1940), and McCormick, Evidence § 12 (1972 ed.), although, of course, the jury must be properly instructed as to its function. The contrary statement in United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617 (1935), must be regarded as an aberrational departure from the permissive rule earlier announced in Transportation Line v. Hope, 95 U.S. 297, 24 L.Ed. 477 (1877). The federal courts have chosen to follow Hope and ignore Spaulding. See, in addition to the Wigmore and McCormick treatises, Carlson v. Chisholm-Moore Hoist Corp., 281 F.2d 766, 772 (2 Cir. 1960), and cases there cited; Proposed Federal Rules of Evidence, Rule 704.

■ (6) We likewise see no basis for objection to the government's asking two bank employees whether they had identified the other three robbers as Horsun Howard, Jerome Reide and Johnny Sellers. This was relevant in view of testimony that Fernandez had admitted acquaintanceship with Reide and Howard, and that one of his alibi witnesses knew Howard and the others, Reide and Sellers.

(7) Related to the defense argument that the robber identified as Fernandez was not standing where Mrs. Kalata and Mr. Pesch had placed him, defense counsel makes strenuous objection to the alteration of a diagram of the bank, introduced as Exhibit 1 in the first and second trials and as Exhibit N at the third, by the government's "whitening" two places where Mr. Pesch had put marks. The "whitening" appears to have been to permit use of the exhibit at the trial of another robber and, as the government concedes, was an inexcusable breach of the duty of counsel to keep exhibits left in their custody inviolate so long as there is any possibility of need for their reuse.[21]

20. Sweeney was uncertain whether his affidavit seeking an arrest warrant had mentioned two of the informants. Even if the arrest warrant was therefore invalid, none is required for a day-time arrest, even in a dwelling, which has been made on probable cause, especially when, as here, no force was used. United States v. Hall, 348 F.2d 837, 841 (2 Cir. 1965). Contrast Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958); Coolidge v. New Hampshire, 403 U.S. 443, 474 (Stewart, J.), 492 (Harlan, J.), 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), with respect to a "forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought."

21. This incident again calls in question the practice of permitting counsel to retain exhibits. See our remark in United States v. Silverman, 430 F.2d 106, 127 n. 2 (2 Cir. 1970), to which we referred in our earlier opinion in this case, 456 F.2d at 643 n. 4. On representations by some district courts that a uniform practice requiring all exhibits save those of unusual bulk to be left with the clerk would not be feasible, we adopted Local Rule § 11. If experiences like that here discussed should recur, reconsideration of that Rule may be needed.

Defense counsel complains that during the first trial, before Judge Bruchhausen, Mr. Pesch marked on what is now Exhibit N as "P 2" the spot where a robber *other* than the one Pesch now identifies as Fernandez was standing; that no "P 2" can now be seen on the exhibit but that a whitening appears where the alleged Fernandez stands in the surveillance film. Although there is indeed a whitening in this spot, it is now in the process of peeling off because of handling and there appears to be a "P" and quite possibly a "P 2" underneath. We thus do not think defense counsel will be handicapped in making this argument, which indeed she advanced in the present trial.

The other claim is that at the second trial, before Judge Costantino, Mr. Pesch was asked to indicate on Exhibit N where Fernandez was during the robbery, to which he responded "Up in this area (indicating)." At the judge's request he then put an "FF" on the spot. Counsel says that the "FF" was whitened over, a fair inference since it is not to be found on the exhibit, and that the "FF" was in a spot *behind* the teller's windows now covered by a whitening and a "P." At the third trial Mr. Pesch was shown the "P" and he denied having made it. In the present state of the exhibit it is impossible to tell where Mr. Pesch had placed the "FF"; there are other "whitenings" in addition to the two here discussed. The government should give the defense all possible aid in attempting to restore the exhibit to the form it was in after the second trial, perhaps, if the defense desires, by hiring a disinterested expert in an attempt to remove the various whitenings. However, we are unwilling to hold that if this should fail, Fernandez would be entitled to dismissal of the indictment; this will be for the district judge to determine in the first instance, on all the evidence before him.

As previously indicated, it is important to the interests of justice that, whatever the outcome, Fernandez' fourth trial should be the last. To that end we strongly urge some lowering of temperature on the part of counsel for both sides. Defense counsel seems to have been convinced that the government was pursuing a studied course of balking at the disclosure of evidence to which the defense was entitled; the prosecution seems to have been equally convinced that all this was a ploy designed to prevent a trial or make a record for appeal. We suggest that counsel put away such ideas, no matter how sincerely held, and recognize that while each has a task to perform with vigor and determination, this is not inconsistent with due regard and cooperation. In particular we urge the government to be forthcoming in disclosure except when, as in the case of the informants discussed in Section IV(1) above, this might entail danger to other persons or the drying up of important sources of information. If the government can help the defense locate the former bank employee, Anthony Benjamin, it should do so; if it cannot, the record on that subject should be plain. We are unclear what has happened to the list of 30 persons in the bank at the time of the robbery [22] and the list of nine made up by Agent Sweeney in the course of the first trial, see 456 F.2d at 643 n. 4. If these still exist, they should be promptly made available; if they do not, the government should explain how they disappeared. We observe finally that methods of cross-examination by a prosecutor popularized by television should not be the norm for the court room; while cross-examination may be vigorous, witnesses deserve to be treated with proper respect.[23]

---

22. The surveillance pictures confirm that such a list was made. Defense counsel particularly emphasizes two orientals who, as the pictures show, had an especially good opportunity to observe the robber claimed to be Fernandez. The defense should be given their names if these are available.

23. In light of our holding in Part III, we are not obliged to pass on the defense's

The judgment of conviction is reversed for a new trial.

## APPENDIX

During cross-examination on Vandivert's qualifications to estimate the robber's height by the process described above, the following occurred:

The Court: In other words, this is the first time using a transparency?

The Witness: Using a transparency. However, I have—and I did the other day in projection make—make an—make a tracing, and came to some conclusions as to—as to height.

The Court: How do you do that? I want to hear this.

The Witness: This is—

The Court: Now let's not go off into something else. Let's go to what you just said.

The Witness: I'm not, I'm not. I'm saying that this is not the sort of thing that one can give an estimate in evidence—

The Court: Now, I didn't ask you that opinion, Mr. Vandivert.

The Witness: Vandivert.

The Court: You're smart enough to know that there is such a thing as answering a question.

The Witness: Correct.

The Court: So don't throw in a kettle —

The Witness: I'm not.

The Court: (continuing)—when you talk about peaches and apples, don't throw an apple in the way of a peach then by using your own expression.

Answer my question.

The Witness: I—I made—I made an estimate based on my knowledge of—of 35 millimeter lenses.

The Court: Looking at a picture?

The Witness: Looking at a picture.

The Court: Just looking at a picture you can tell me how high or how tall—

The Witness: I said to you earlier, your Honor, that I could not tell height without a comparison. And this is the first time I've had an honest comparison.

The Court: Then how did you do it previous to this if you didn't use a transparency, how did you do it before? That's all I asked you, and please stick to that question.

The Witness: I couldn't do it scientifically.

The Court: You couldn't do it. That's all I want to know.

Although Vandivert had made clear that the only conclusion by which he would stand was that the light skinned robber was 6″ shorter than O'Connor, who he thought was 6′ tall, pages were devoted to the following:

The Court: Supposing you were told he was 6-2, would that make the bank robber 8 inches smaller rather than 6?

The Witness: I have said that—

The Court: You said 6 inches.

The Witness: I believe there is six inches difference.

The Court: Based upon the 6 feet?

The Witness: Based upon—

The Court: That would make him 5-6, you said that?

The Witness: No. Your Honor, I thought there was six inches difference between the two men and that would obviously make the bank robber somewhere possibly around 5 feet 8 or if O'Connor was 6 feet 2—

claims of prosecutorial misconduct. However, the summation by the Assistant who tried the case surely went to the verge and perhaps beyond it. As this court warned only last year, the use of "first-name epithets at a defendant that might be commonplace in a second-rate movie or television script" is "beneath the dignity of the United States Attorney's office and of the United States as a sovereign," United States v. Benter, 457 F.2d 1174, 1177 (2 Cir. 1972), notwithstanding the sincerity of the prosecutor's belief that the defendant is guilty or that perjury has been committed.

The Court: Didn't you say in answer to one of my questions that he was 6 inches shorter than Mr. O'Connor?

The Witness: I said that he was six inches shorter and I have just finished saying that if O'Connor is six feet two, that would make my estimate of the bank robber—

The Court: No. This is based upon your information, based upon your opinion, based upon the photographs that you superimposed and you said on that basis.

The Witness: I have to go from a known fact about O'Connor as the only index of height in the—

The Court: What's the known fact that you used?

The Witness: I used 6 feet or 6 feet 2. It doesn't matter. We can go from that. I say there is six inches between the two.

The Court: You used 6 feet—

The Witness: I used six feet because that's the information that's been given to me.

The Court: If you used six feet, is that the reason why you told me that he was six inches shorter?

The Witness: No. My estimate of the difference in height between the two, in a comparison of the photographs and the transparency, is six inches.

The Court: According to your own testimony, in other words, he could also be 5 foot 8?

The Witness: That's right.

The Court: This so-called robber? Is that the robber?

The Witness: That is the bank robber here and Mr. O'Connor.

The Court: In other words, he could also be 5 foot 8?

The Witness: That's right, Your Honor. I am not trying to put a height to the bank robber.

The Court: Because you told me earlier you can't distinguish height from a photograph?

Don't change that now.

The Witness: I won't change that. It can be done geometrically, but I am not competent to do that.

Later the court interjected, without the slightest need:

The Court: You looked at the whole film and—

The Witness: I haven't had the time to go into this exhaustively or to get prints off the film.

The Court: You told us earlier—

The Witness: I haven't examined the films. To do this you have to have—

The Court: Are you anticipating something?

The Witness: No.

The Court: Then why don't you wait until I ask a question.

The Witness: I am sorry.

The Court: Because you are anticipating what I have in mind.

The Witness: No. I'm sorry.

The Court: No, you are not, are you?

The Witness: I am sorry.

The Court: Tell me when did you get that film to look at? You told us earlier when. Tell me again.

The Witness: I went over it on Sunday.

The Court: You knew you were going to testify with regard to a transparency and its superimposition upon another photo, didn't you?

The Witness: This opportunity occurred when I came—

The Court: Did you know?

The Witness: I didn't.

The Court: In other words, when you were called upon Sunday—

The Witness: I had no way of knowing where—

The Court: How did you get the film Sunday?

The Witness: I got it from Mrs. Piel.

The Court: Did she tell you at that time to look at it because you might testify or did she show it to you just to show it to you?

The Witness: She showed it to me in case I had to testify about this film.

The Court: Did she tell you that she was going to ask you to come in to testify?

The Witness: Oh, yes.

The Court: Did she tell you that a Mr. Webb had testified with regard to height and that he had used—

The Witness: She mentioned that a Mr. Webb had testified with regard to height.

The Court: And that he had used transparencies, superimposed upon pictures which—

The Witness: She didn't tell me that, no.

The Court: So that you didn't know what you were coming in to testify about today?

The Witness: I knew that I was coming in to testify about a number of things, your Honor.

The Court: Did you know that you were going to be asked—

The Witness: Look, yesterday morning, I put these photographs together.

The Court: Did you do that voluntarily without anybody telling you about it?

The Witness: No. Mrs. Piel gave the photographs to me yesterday morning to make a comparison with.

The Court: By way of using a transparency superimposed upon a picture, right?

The Witness: That's right.

The Court: That's the first time you heard of that, yesterday morning?

The Witness: No. I believe she had mentioned that there were transparencies and photographs and comparisons. could be made.

The Court: When did you hear that?

The Witness: It could have been Sunday.

The Court: You had a chance to go through that whole reel of film; is that right?

The Witness: That's right.

The Court: You can see them, can't you, like anybody else can?

The Witness: Yes. I projected them. I had them projected against the wall.

The Court: Great, you projected. Did you make an attempt to project the entire reel in order to get a particular picture that you might figure would help you in making this comparison for height purposes?

The Witness: I had already seen exhibits that were used—

The Court: I didn't ask you that.

The Witness: I am sorry, your Honor. I am trying to explain.

No, I didn't do that.

The Court: You didn't do that?

The Witness: No.

The Court: Do you know that if you had done it, you could have asked Mrs. Piel to blow one up and to make a picture out of it like the others are; is that right?

The Witness: That's right.

The Court: You didn't do that?

The Witness: No.

The Court: In other words, you relied only upon the pictures that you saw that were given to you.

The Witness: That's right.

The Court: And disregarded entirely the—I don't know how many numbers or how many hundreds, rather, of frames there are in that roll of film.

The Witness: There aren't that many pertinent frames when you get down to that.

The Court: I didn't ask you that.

The Witness: Yes, I disregarded that. I will tell you why. Do you want to know?

The Court: Sure, tell me. You might as well, you are telling me everything else.

The Witness: After all, seeing this on Sunday and having to come to court, there isn't the time to spend in preparation that the FBI has had.

The Court: You testified in this matter before, did you not?

The Witness: I haven't had that roll of film to work over.

The Court: I didn't ask you that. You testified in this matter?

The Witness: Yes.

The Court: You knew—

The Witness: I used the exhibits which were brought in by the FBI.

The Court: You knew in the previous testimony, which was at least a year ago, that there was a serious issue here of identification?

The Witness: That's right.

The Court: So when you are called upon to testify as an expert, wouldn't you take everything that's available to you plus ask for whatever things you may need in order to make a valued opinion judgment?

The Witness: I certainly would, your Honor. But I want to make one point very clear.

The Court: Don't you take those words, they are not yours.

The Witness: I was not asked to come into this as an expert witness until Sunday.

After Vandivert, on redirect examination, had briefly reiterated his opinion that the light skinned black in the surveillance pictures and Fernandez were not the same person, the court cross-examined for more than twenty-three pages of the transcript. This included such interchanges as the following:

The Court: Do you like to assume things when they fit your purposes?

The Witness: I spend a lot of time trying to work out answers.

The Court: I know you do. I know you do.

\*　　\*　　\*　　\*　　\*　　\*

The Court: No, height doesn't identify anybody, does it?

The Witness: Yes, if that man is 6 feet tall or—

The Court: All it would identify him with is another 6 foot tall person, and it could be anybody, it could be me—

The Witness: We have a—well, you weren't there.

The Court: No, were you?

The Witness: No.

The Court: Well, let's start off—

The Witness: Let's—Let's—

The Court: Don't you ask the questions, will you please. Why can't you answer questions?

The Witness: I can, I've just said that my estimate—

The Court: Please stop right there. Do you know what a question is?

The Witness: Yes.

The Court: And do you know what an answer is?

The Witness: Yes.

The Court: Then supposing you let me question, and you answer.

\*　　\*　　\*　　\*　　\*　　\*

The Court: Well, you tell me what you can say from that?

The Witness: I can say, and I have said, your Honor, that the bank robber is six inches shorter than Mr. O'Connor.

The Court: All right, then that means that this bank robber—

The Witness: That means that—that means that—

The Court: Now please.

The Witness: All right.

The Court: You don't go beyond—don't you go telling me what—Because you give me that kind of an opinion, I'm going to throw your whole testimony out, because you couldn't testify to what you were about to say, nobody could.

The Witness: Can't I?

The Court: No, and I don't agree that you can either. You can tell me that from this transparency—right? Are you listening to me?

The Witness: I'm listening to you.

The Court: From this transparency all that shows you is that person is ap-

proximately six inches shorter than Mr. O'Connor?

The Witness: That's correct.

The Court: Right.

And on the basis of that you can say that this bank robber is not the defendant in this case?

The Witness: That's correct.

The Court: All right now, what do you have about the defendant, known defendant, because—

The Witness: I—

The Court: (continuing)—apparently you say this man is not the defendant?

The Witness: I say he's not.

The Court: You say he is not. All right, what are you comparing that on?

The Witness: On the basis of—on the basis of height. At the earlier—at the earlier—

The Court: I'm willing to concede to you for the sake of argument, for the purpose of argument—

The Witness: Yes.

The Court: Now tell me what that proves other than the fact that this person in this transparency is 6 inches shorter?

The Witness: Well—

The Court: It doesn't prove that he's either you or me or anybody else?

The Witness: Well, it proves—it proves—

The Court: Including Mr. Fernandez?

The Witness: Your Honor, I am—I am six feet five inches tall, and if—if I were identified for—in a—in a case as being 6 feet 11, it's obvious there is a discrepancy.

I—

The Court: Nobody has made that comparison as yet.

The Witness: No, but it was made—it was made—

The Court: It was not in the questions that I've been asking you, sir.

The Witness: Well—

The Court: And you have been asked just to answer my questions.

The Witness: All right, your Honor.

\* \* \* \* \* \*

The Court: Mr.—Mr.—Mister, it's not so difficult. You aren't trying to evade my questions, are you?

The Witness: Oh, no. No, I'm not.

The Court: You're making a wonderful attempt at doing so.

The Witness: I'm probably—

The Court: I ask you by virtue of your same reasoning, when you say that this man in this transparency, who is the known robber—

The Witness: Yes.

The Court: Right?

The Witness: Yes.

The Court: (continuing)—is six inches shorter than Mr. O'Connor—

The Witness: Yes.

The Court: So we know now to start off with that the person who did rob the bank is six inches shorter than Mr. O'Connor?

The Witness: That's right.

The Court: Does that prove who he is?

The Witness: Not at all.

The Court: And does it prove who he is not.

The Witness: Yes.

The Court: Would it prove that he is not any other person five foot six or taller?

The Witness: It proves he is not a person 6 feet tall, and in the earlier case and in this case—

The Court: Oh, of course, it would prove that he's not six foot two or six foot, like Mr. O'Connor?

The Witness: Right.

The Court: Well, that's all, that's just excluding everybody.